# Illinois Official Reports

## Appellate Court

---

### *People v. Stolberg*, 2014 IL App (2d) 130963

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD STOLBERG, Defendant-Appellant. |
| | |
| District & No. | Second District<br>Docket No. 2-13-0963 |
| | |
| Filed | September 23, 2014 |
| | |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court affirmed defendant's conviction for involuntary manslaughter and sentence to eight years' imprisonment for the death of his wife, who had suffered a mental breakdown and still had mental-health issues, in an incident during which he laid on top of her in order to restrain her from "poking" him while he was trying to sleep, notwithstanding his contention, *inter alia*, that he was prejudiced when his wife's body was cremated shortly after her death and he had made a discovery request for exculpatory evidence, since the evidence was sufficient to establish defendant's guilt beyond a reasonable doubt and there was no showing that the victim's body was material exculpatory evidence or that bad faith was involved in cremating the body. |
| | |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 11-CF-1849; the Hon. Mark L. Levitt, Judge, presiding. |
| | |
| Judgment | Affirmed. |

| Counsel on Appeal | William K. Hedrick, of Wilmette, and Kevin M. Rosner, of Northbrook, for appellant. |
| | |
| | Michael G. Nerheim, State's Attorney, of Waukegan (Lawrence M. Bauer and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | JUSTICE HUTCHINSON delivered the judgment of the court, with opinion. |
| | Presiding Justice Burke and Justice Birkett concurred in the judgment and opinion. |

## OPINION

¶ 1    In 2013, a jury convicted defendant, Ronald Stolberg, of one count of involuntary manslaughter of a family or household member pursuant to section 9-3(f) of the Criminal Code of 2012 (the Criminal Code) (720 ILCS 5/9-3(f) (West 2012)). The conviction stemmed from an incident where the victim, who had a history of mental-health issues, "poked" defendant while he was sleeping, and defendant lay on top of the victim and restrained her wrists. Following his conviction, the trial court sentenced defendant to a term of eight years' imprisonment.

¶ 2    Defendant now appeals, contending that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) he suffered substantial prejudice when the victim's body was cremated after he had made a discovery request for all potentially exculpatory evidence; (3) the trial court erred in not suppressing statements that defendant made after he invoked his right to counsel; and (4) his sentence was excessive and otherwise improper. We affirm.

¶ 3                              I. BACKGROUND

¶ 4    The record reflects that defendant and the victim were married in 2007 in Las Vegas and resided in Vernon Hills. Defendant worked as a repair technician for a company in Buffalo Grove. The victim worked for an advertising agency in Chicago before having a mental breakdown. She ultimately stopped working. Before their marriage, the victim began taking psychotropic medications, and she stopped taking the medications in 2008. On May 6, 2011, while at her sister's house, the victim talked about how "drug dealers are going to come and rob us," among other things, and began slapping herself. The next morning, the victim went to see her therapist. The victim was admitted to Alexian Brothers and was hospitalized for one night. After being discharged, the victim stayed with defendant's mother for approximately 12 days before returning home. In early June 2011, a neighbor observed the victim standing under a tree for approximately five to seven hours on a "[v]ery, very warm and humid" day.

¶ 5    On June 7, 2011, defendant was asleep in the master bedroom while the victim slept on the couch in the living room. The victim entered the master bedroom and "poked" defendant, which awakened him. The "poking" occurred at least four separate times, with defendant

- 2 -

having to walk the victim out of the room on a few instances. Defendant would hold the victim's wrist to calm her down. The last time that the victim "poked" defendant, he held her by her wrists and walked her back to the living room. Defendant brought the victim to the floor and lay on top of her while she was lying facedown. Defendant remained on top of the victim until she stopped struggling. The victim was still breathing. Defendant returned to the master bedroom and went to sleep.

¶ 6    The next morning, defendant left for work at approximately 7 a.m. As he left, he noticed that the victim was still lying down. Defendant nudged the victim to see if she would wake up, and when she did not, defendant left for work because he thought that she was pretending to be asleep. While at work that day, defendant told a coworker that "[the victim] was dead." When the coworker asked why defendant said that, he responded, "[s]he kept waking me up." According to the coworker, he did not take defendant's comment literally. Defendant attempted to call the victim while he was at work, but her phone was turned off. When defendant returned home, he found the victim lying in the same spot and in the same position. When he rolled her over, he discovered that she was blue and he called 911.

¶ 7    Once law enforcement officers arrived, defendant related his version of events, including that the victim suffered from mental-health issues and was not eating or sleeping. Defendant's mother arrived on the scene and told defendant "[c]ongratulations, ***. You did the right thing." Defendant responded to his mother's comment by noting that he called "the doctor," "the police," and "the hospital." Defendant voluntarily removed his shirt and there was no indication of bruising on his chest, back, or arms. Law enforcement officers transported defendant to the Vernon Hills police department.

¶ 8    Thereafter, the police decided to transfer defendant to the Mundelein police department. At the station, the police placed him in an interrogation room and advised him of his *Miranda* rights. Defendant said that he "want[ed] a lawyer." Defendant continued to converse with the police "for a while." The police planned to transfer defendant back to the Vernon Hills police department. While in the police vehicle, defendant asked why no one was talking to him and a police officer noted that defendant had said that he wanted an attorney. Defendant said that, if he could talk to his mother, he would then talk to the police. The police drove defendant back to the Mundelein police department.

¶ 9    At the Mundelein police station, police officers once again placed defendant in an interrogation room while other officers went to get his mother. An officer again advised defendant of his *Miranda* rights. Defendant gave his permission for an officer to remain in the room until his mother arrived. The officer asked defendant what he would like to talk about and defendant responded, "[the victim] was sick." Defendant described the victim's mental-health issues. In describing the previous night, defendant told the officer that he lay on top of the victim for several minutes and that he had his hands around her wrists. When asked about the victim's breathing, defendant responded that it "was slower" and that she "slowly gave up." The interview lasted approximately 3½ hours.

¶ 10   On June 9, 2011, the State charged defendant with first-degree murder. On June 10, 2011, defendant appeared and filed a motion for discovery, including for the production of "[a]ny evidence which tends to negate [defendant's] guilt." Following an autopsy, the victim's body was released for cremation on June 14, 2011, and cremated later that day. The coroner released the body after speaking with a law enforcement officer, who verified to the coroner that there

was no need to hold the body any longer. The coroner did not reach out to defendant or any other family member before releasing the body for cremation.

¶ 11    On September 30, 2011, defendant filed a motion to dismiss the indictment, arguing that substantial prejudice resulted from the State releasing the victim's body without giving notice. Following a hearing, the trial court denied the motion. The trial court concluded that failing to preserve evidence in a criminal matter does not constitute a denial of due process unless the defendant can establish bad faith. The trial court opined that defendant would have other ways of preparing a defense, including reviewing the autopsy report, cross-examining the medical examiner, and testing samples taken during the autopsy. The trial court concluded that the State allowing the victim's body to be cremated did not constitute bad faith.

¶ 12    At trial, Dr. Manny Montez, a forensic pathologist, testified. Montez testified that he was not board certified in forensic pathology. Montez described injuries on the victim's body, including discolorations of the skin in the chest area and near both hips that were contusions caused by force. Further, evidence of bleeding and fat liquification were consistent with the victim having been ground into a hard surface while she was alive. Montez testified that the victim's tailbone had a discoloration that was consistent with "some type of force" being applied to the skin's surface. Montez testified that the victim's injuries could have been caused by someone having his knee or the small of his palm on the victim's back while pressing down. Montez opined that the victim died of traumatic asphyxia during physical restraint.

¶ 13    Dr. Skahu Teas, a board-certified physician in anatomic and clinical pathology, testified on defendant's behalf. Teas opined that Montez did not explain how he arrived at his conclusion that the victim died of asphyxia during restraint, and she could not find any objective evidence to support that conclusion. Teas further noted that Montez did not perform any histology, which involves examining tissue from the vital organs. However, she later testified that she had examined certain tissue slides prepared from the autopsy. Teas explained that organ tissue may look normal grossly but that viewing the tissue under a microscope could reveal subtle changes that indicate a physiological death rather than an anatomical death. Teas testified that the victim died of natural causes, most likely a cardiac arrhythmia due to a hypertrophic heart and myocardial ischemia. Teas testified that, based on her examination of the victim's medical records, the victim had a heart murmur and a history of scarlet fever, which could cause "issues with the conduction system in the musculature of the heart." Teas was not aware that the victim's body had been cremated a few days after Montez performed the autopsy, but she testified that it "[made] no difference to [her]."

¶ 14    On May 28, 2013, the jury found defendant not guilty of first-degree murder but guilty of involuntary manslaughter. On June 7, 2013, defendant filed a motion for a judgment notwithstanding the verdict or for a new trial. Among other assertions, defendant argued that the trial court erred in denying his motion to dismiss the indictment. The trial court denied the posttrial motion and, following a hearing, sentenced defendant to a term of eight years' imprisonment. After the trial court denied defendant's motion to reconsider his sentence, defendant timely appealed.

¶ 15                                      II. ANALYSIS
¶ 16                              A. Sufficiency of the Evidence
¶ 17    Defendant's first contention on appeal is that the State failed to prove him guilty beyond a reasonable doubt. Defendant asserts that the jury's verdict "seemed to find that [he] did not

intend or desire the result which occurred," suggesting that his actions amounted to something less than criminal recklessness. Defendant also questions the State's presentation of evidence about his disdain for the victim's medicines and hospital care, in conjunction with the corresponding specific jury instructions. While these latter arguments might have appeal on the merits, defendant does not develop them. Instead, defendant focuses on the sufficiency of the evidence, and our comments will address that issue. In advancing this contention, defendant directs us to the conflicts between Montez's and Teas's testimony, and argues that the evidence is devoid of any indication that the victim suffered trauma or life-threatening injuries.

¶ 18    When presented with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Rather, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The reviewing court should not substitute its judgment for that of the trier of fact, which is responsible for weighing the evidence, assessing the credibility of witnesses, resolving conflicts in the evidence, and drawing reasonable inferences and conclusions from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). However, a reviewing court must set aside a defendant's conviction if a careful review of the evidence reveals that it was so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). "A defendant commits involuntary manslaughter when he unintentionally causes the death of an individual by acts that are performed recklessly and are likely to cause death or great bodily harm to another." *People v. Greer*, 336 Ill. App. 3d 965, 977 (2003).

¶ 19    Defendant cites *People v. Ehlert*, 211 Ill. 2d 192 (2004). In *Ehlert*, the defendant gave birth in her home and, a few days later, park district employees found a baby's corpse in a nearby lake. *Id.* at 195. In charging the defendant with first-degree murder, the State's theory was that she hid her pregnancy and placed the baby in a plastic bag and either threw it in a creek or placed it near the creek. *Id.* at 205. Following a bench trial, the trial court found the defendant guilty, but the appellate court reversed after concluding that there was insufficient evidence that the baby was born alive. *Id.* at 203-04.

¶ 20    Our supreme court affirmed the appellate court's reversal. The court noted that the medical examiner testified that she found no unusual cause of death and no marks on the baby indicating foul play. Although she surmised that the baby had drowned, she did not determine the manner of death to a reasonable degree of medical certainty at the time of the autopsy. *Id.* at 205-06. The medical examiner acknowledged on cross-examination that, when she performed the autopsy, she could not determine whether the baby was born alive. *Id.* at 207. Thereafter, the police advised the medical examiner of the results of their investigation, including that someone heard the baby crying. *Id.* at 206. The medical examiner found the report " 'very significant' " and said that it confirmed her suspicions that the baby was born alive. *Id.* She then listed the death as a homicide. *Id.* at 207. The medical examiner further acknowledged on cross-examination that the baby could have died of natural causes. *Id.* at 209. The supreme court found that reasonable doubt existed regarding the defendant's criminal agency. *Id.* at 209-10.

¶ 21    We find the circumstances here distinguishable from those in *Elhert*. Montez testified that the discolorations in the victim's chest and hips were contusions caused by force. Montez further testified that evidence of bleeding and fat liquification, along with discoloration on the victim's tailbone, were consistent with force being applied to the victim. Most important, unlike the medical examiner in *Elhert*, Montez was able to determine the manner of death, as traumatic asphyxia due to restraint, at the time of the autopsy.

¶ 22    We recognize that Teas testified that, based on her review of the autopsy report and the victim's medical records, she believed that the victim died of natural causes. However, it was the function of the jury, as the trier of fact, to resolve conflicts in expert testimony. See *People v. Slover*, 2011 IL App (4th) 100276, ¶ 22 (noting that the trier of fact executed its function in resolving conflicts between the parties' expert witnesses and that its reliance on the State's expert over the defendant's expert did not render its decision erroneous). Thus, we conclude that the State produced sufficient evidence to prove defendant's guilt beyond a reasonable doubt.

¶ 23                               B. Spoliation of Evidence

¶ 24    Defendant's next contention on appeal is that the trial court erred in denying his first motion to dismiss the indictment, based on the State's spoliation of evidence. Defendant argues that the trial court should have dismissed the indictment because the State, after being served with a discovery request, released the victim's body for cremation. Specifically, defendant argues that "following [his] first court appearance, the defense was not required to make an independent showing that the evidence had exculpatory value in order to establish a due[-]process violation. The State's duty at this juncture was one of preservation, which was circumvented by the destruction of the decedent's body." Defendant maintains that he suffered "substantial prejudice" from the State's failure to preserve the victim's body.

¶ 25    A discovery violation may be analyzed either as a due-process violation under *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), or under Illinois Supreme Court Rule 415(g)(i) (eff. Oct. 1, 1971). *People v. Borys*, 2013 IL App (1st) 111629, ¶ 17. With respect to due process, defendant cites, among other cases, *People v. Newberry*, 166 Ill. 2d 310 (1995). In *Newberry*, the State charged the defendant with possession of a controlled substance with intent to deliver. *Id.* at 312. Defense counsel filed a discovery motion pursuant to Rule 415 requesting "all tangible objects that had been seized from [the defendant]." *Id.* Thereafter, the State accidentally and without bad faith destroyed the cocaine found on the defendant's person. *Id.* at 313. The trial court dismissed the indictment and the appellate court affirmed. *Id.* Our supreme court also affirmed, holding that due process "mandated" the dismissal. *Id.* at 311. In reaching its determination, our supreme court concluded:

> "Where evidence is requested by the defense in a discovery motion, the State is on notice that the evidence must be preserved, and the defense is not required to make an independent showing that the evidence has exculpatory value in order to establish a due[-]process violation. [Citation.] If the State proceeds to destroy the evidence, appropriate sanctions may be imposed[,] even if the destruction is inadvertent. No showing of bad faith is necessary. [Citation.]" *Id.* at 317.

Our supreme court also concluded that dismissing the action was an appropriate sanction under Rule 415(g)(i). *Id.* at 311.

¶ 26      After *Newberry*, the United States Supreme Court issued *Illinois v. Fisher*, 540 U.S. 544 (2004). In *Fisher*, the State charged the defendant with possession of cocaine and, eight days later, defense counsel issued a discovery motion for all physical evidence that the State intended to use at trial. *Id.* at 545. While released on bond, the defendant fled and remained a fugitive for 10 years. After the defendant was apprehended, the State reinstated the charges. *Id.* Before trial, the State advised the defendant that it had destroyed the substance that it retrieved when initially arresting him. *Id.* at 546. The trial court denied the defendant's motion to dismiss and a jury convicted him. *Id.* The appellate court, relying on *Newberry*, reversed. The court concluded that, although the State did not act in bad faith, it destroyed the evidence after the defendant had issued a discovery request. *Id.* at 546-47.

¶ 27      The United States Supreme Court disagreed. In doing so, the Court concluded that the evidence seized was merely "potentially useful" evidence as opposed to "material exculpatory" evidence. (Internal quotation marks omitted.) *Id.* at 548. Therefore, the defendant had to prove that the State acted in bad faith when destroying the evidence. *Id.* at 547-48. In reaching its determination, the Court opined:

     "We have never held or suggested that the existence of a pending discovery request eliminates the necessity of showing bad faith on the part of police. Indeed, the result reached in this case demonstrates why such a *per se* rule would negate the very reason we adopted the bad-faith requirement in the first place: to 'limi[t] the extent of the police's obligation to preserve evidence to reasonable grounds and confin[e] it to that class of cases where the interests of justice most clearly require it.' [Citation.]

     We also disagree that *Youngblood* does not apply whenever the contested evidence provides a defendant's 'only hope for exoneration' and is ' "essential to and determinative of the outcome of the case." ' *** [T]he applicability of the bad-faith requirement in *Youngblood* depended not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between 'material exculpatory' evidence and 'potentially useful' evidence. [Citation.] As we have held [citation], the substance destroyed here was, at best, 'potentially useful' evidence, and therefore *Youngblood*'s bad-faith requirement applies." *Id.* at 548-49.

¶ 28      While *Fisher* supersedes *Newberry* with respect to due process under the fourteenth amendment to the United States Constitution (*People v. Kizer*, 365 Ill. App. 3d 949, 960 (2006)), our supreme court has not determined whether the due-process clause in the Illinois Constitution provides broader protection (*People v. Sutherland*, 223 Ill. 2d 187, 240 (2006) ("We find it unnecessary to decide whether the outcome-determinative analysis adopted in *Newberry* still has vitality in light of the *Fisher* opinion because, even if it does, *Newberry* is inapplicable under the facts present here.")). However, the Illinois Appellate Court, Fourth District, has concluded that our supreme court would likely adopt the analysis in *Fisher* when interpreting the due-process clause in the Illinois Constitution. *Kizer*, 365 Ill. App. 3d at 960-61. The court in *Kizer* noted that our supreme court had declined an invitation to interpret the Illinois due-process clause more broadly than the federal due-process clause and had recently reaffirmed the "limited lockstep analysis" when interpreting the Illinois due-process clause. (Internal quotation marks omitted.) *Id.* at 961. This court subsequently agreed with *Kizer*'s rationale. *People v. Voltaire*, 406 Ill. App. 3d 179, 183 (2010). Thus, pursuant to *Fisher*, and contrary to defendant's argument, he was required to establish that the victim's

body was material exculpatory evidence or, if the victim's body was merely "potentially useful" evidence, that the State acted in bad faith.

¶ 29    In this case, defendant failed to demonstrate that the victim's body was material exculpatory evidence. On the contrary, Teas testified that she was not aware that the victim's body was cremated a few days after Montez performed his autopsy. She clarified that it "[made] no difference" to her. As a result, the victim's body would have provided potentially useful evidence as to the cause of death, but her body would not have exculpated defendant.

¶ 30    Further, we agree with the trial court that the mere assertion that the State allowed the victim's body to be cremated, without more, is insufficient to establish bad faith. Therefore, the trial court did not err in concluding that defendant failed to establish bad faith. See *Kizer*, 365 Ill. App. 3d at 961.

¶ 31    With respect to a Rule 415 analysis, we initially note that it is unclear whether the trial court made a determination regarding a discovery violation under the rule. In any event, the trial court would not have erred in declining to impose sanctions. Illinois law is well settled that "[s]anctions are intended to accomplish the purpose of discovery, not to punish the offending party." *People v. Scott*, 339 Ill. App. 3d 565, 572 (2003). The standard of review for a ruling on a discovery sanction is whether the trial court abused its discretion. *People v. Mullen*, 313 Ill. App. 3d 718, 736 (2000). Here, we have already concluded that the trial court did not err in finding that defendant failed to establish that the State acted in bad faith by not preserving the victim's body. To the extent that it relied on Rule 415, the trial court did not abuse its discretion in refusing to dismiss the indictment. See *People v. Walton*, 376 Ill. App. 3d 149, 158 (2007) (holding that the trial court did not abuse its discretion by admitting materials that the State failed to disclose, in part because the State did not act willfully).

¶ 32    Finally, defendant notes that section 3-3034 of the Counties Code provides:

"After the inquest the coroner may deliver the body or human remains of the deceased to the family of the deceased or, if there are no family members to accept the body *** then to friends of the deceased, if there be any, but if not, the coroner shall cause the body or the remains to be decently buried, cremated, or donated for medical science purposes ***. The coroner may not approve the cremation or donation of the body if it is necessary to preserve the body for law enforcement purposes." 55 ILCS 5/3-3034 (West 2012).

Defendant emphasizes that the State denied him the opportunity to conduct his own forensic examination or autopsy. Defendant further argues that preserving the victim's body was necessary for law enforcement purposes. According to defendant, the destruction of the victim's body in violation of section 3-3034 resulted in a due-process violation that "substantially impair[ed] the defense of this case."

¶ 33    Defendant's argument is belied by testimony from his expert witness. Teas testified that the victim's body being cremated a few days after Montez performed his autopsy made "no difference" to her. Although she could not examine the body, Teas was able to review the autopsy report and the victim's medical records. In doing so, she reached the conclusion that the victim died of natural causes, not asphyxiation, and defendant presented that defense. Thus, the record is devoid of any indication that the cremation of the victim's body impaired the defense, because defendant "had an alternate means of raising doubt in the mind of the trier of fact as to the cause of death." *People v. Jordan*, 103 Ill. 2d 192, 212 (1984).

¶ 34        Despite our holding, we nonetheless express our concern over the circumstances leading to the victim's body being cremated. We note that section 5-1085.5 of the Counties Code (55 ILCS 5/5-1085.5 (West 2012)) provides:

> "Each county *** must establish a written protocol to deal with homicides and questionable deaths. The protocol must be promulgated by the Coroner, Sheriff, State's Attorney, all fire departments and fire protection districts located in the county, and all police departments located in the county."

Section 5-1085.5 requires a county to adopt uniform procedures concerning homicides and questionable deaths. 55 ILCS 5/5-1085.5(d) (West 2012). In this case, the coroner testified that he merely spoke with a law enforcement officer, who assured him that the victim's body was no longer needed, before releasing the body for cremation. While it is not clear from the record whether Lake County has established a protocol in accordance with section 5-1085.5, we believe that, in light of the questionable and controversial nature of the victim's death, the State should have exhibited more care before releasing the victim's body. Counties are admonished to adopt a protocol pursuant to section 5-1085.5, which would necessarily include ensuring that the body of a person who died under questionable circumstances is not released without adequate caution. Failure to adopt a protocol and adhere to it could impair prosecutions of homicide or questionable-death cases in the future.

¶ 35                                C. Motion to Suppress

¶ 36        Defendant's next contention is that the trial court erred in denying his motion to suppress statements he made after he invoked his right to counsel.

¶ 37        The fifth and fourteenth amendments to the United States Constitution and article I, section 10, of the Illinois Constitution of 1970 prohibit the government from compelling citizens to incriminate themselves. In *Miranda v. Arizona*, 384 U.S. 436, 474 (1966), the United States Supreme Court articulated rules to ensure that the right to be free from coerced self-incrimination retained meaning, including, upon request by the suspect, that the suspect have counsel present during custodial interrogation. An "accused *** having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Thus, the exclusionary rule bars the prosecution from using statements obtained after a defendant invokes his right to counsel, unless the State can establish that (1) the defendant initiated further conversations; and (2) he knowingly and intelligently waived the right he had invoked. *People v. Winsett*, 153 Ill. 2d 335, 350 (1992). The State bears the burden of proving that a defendant initiated further conversations, in that he " 'evinced a willingness and a desire for a generalized discussion about the investigation.' " *People v. Outlaw*, 388 Ill. App. 3d 1072, 1083 (2009) (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983)).

¶ 38        When reviewing a trial court's ruling on a motion to suppress, we apply a two-part standard of review. First, the trial court's factual findings will not be reversed unless they were against the manifest weight of the evidence. *People v. Schuning*, 399 Ill. App. 3d 1073, 1081 (2010). Second, "[w]e review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted." *Id.*

¶ 39    In *Outlaw*, police arrested the defendant, who had invoked his right to counsel after an officer asked him if he wished to cooperate. *Outlaw*, 388 Ill. App. 3d at 1076. While a detective was obtaining booking information, the defendant asked, "What would cooperating mean, what would that entail[?]" (Internal quotation marks omitted.) *Id.* at 1084. The detective explained that the defendant would have to help set people up to purchase drugs in "controlled buys." *Id.* According to the detective, the defendant wished to cooperate and no longer wanted to talk to his lawyer. The court in *Outlaw* held that the defendant's question regarding cooperation "evinced a willingness and desire to discuss the investigation." *Id.*

¶ 40    We find the circumstances in *Outlaw* to be similar to the circumstances here. After defendant had invoked his right to counsel, the police were in the process of transferring him back to the Vernon Hills police department. On the way, defendant asked why no one was talking to him and an officer advised defendant that he had invoked his right to counsel. Defendant said that he would talk to the police if he could first talk to his mother. The police brought defendant back to the Mundelein police department and again gave defendant his *Miranda* warnings. When defendant had a question about his right to an attorney, a detective explained that, if defendant invoked that right, officers could no longer speak to him about the case. Defendant responded "Okay, I understand. So I say that I want a lawyer, the interview is over at that point." Based on the totality of the circumstances, we conclude that defendant initiated further conversations with the police and knowingly and intelligently waived the right that he had invoked. See *id.* at 1084-85.

¶ 41    Defendant further argues that the trial court erred in admitting the video and transcript of his interview, because they were not substantially accurate. Defendant argues that there "were at least 1,090 inaudible passages or other garbled entries on the tape and transcript."

¶ 42    Section 103-2.1 of the Code of Criminal Procedure of 1963 provides that an oral statement made during a custodial interrogation during a murder investigation is inadmissible unless an electronic recording of that interrogation is made and the recording is both substantially accurate and not intentionally altered. 725 ILCS 5/103-2.1(b)(1), (b)(2) (West 2012). Our supreme court has held that a partially inaudible recording is admissible "unless the inaudible portions are so substantial as to render the recording untrustworthy as a whole." *People v. Manning*, 182 Ill. 2d 193, 212 (1998). The decision to admit a partially inaudible recording rests within the trial court's discretion and we will not reverse unless the trial court abused that discretion. *Id.*

¶ 43    In *People v. Harper*, 2013 IL App (4th) 130146, the trial court suppressed the defendant's statements because 30 minutes of a 100-minute interrogation were inaudible due to an unintentional equipment malfunction. *Id.* ¶¶ 7, 15. The reviewing court reversed. In doing so, the court noted that section 103-2.1(f) (725 ILCS 5/103-2.1(f) (West 2012)) provides that the State can overcome inadmissibility if it can show by a preponderance of the evidence that the statements were voluntary and reliable given the totality of the circumstances. *Harper*, 2013 IL App (4th) 130146, ¶ 19. The court concluded that the defendant's statements were voluntary and reliable because the defendant did not contend that he was mentally ill, lacked average intelligence, or was under the influence of a substance that could affect the reliability of the statements. *Id.* ¶ 30.

¶ 44    Similarly, here, defendant makes no such arguments. Instead, defendant argues that the police were "fully aware of the need to make an audible recording" and picked the room for the interrogation. These arguments, even if true, do not rebut the evidence that the police advised

- 10 -

defendant of his *Miranda* rights, that defendant voluntarily spoke with the police regarding the circumstances leading to the victim's death, and that those statements were reliable. Therefore, the trial court did not abuse its discretion in admitting the statements. See *People v. Bauer*, 393 Ill. App. 3d 414, 422 (2009) (holding that the trial court did not abuse its discretion in admitting a recording despite 125 areas where the transcriber could not understand the defendant or the person interviewing her).

¶ 45                                                   D. Sentence

¶ 46    Defendant's final contentions are that his sentence was excessive, that he was entitled to an additional credit for time spent "in custody" before trial, and that he was given an enhanced sentence without the necessary jury finding that the victim was a family or household member. We will address each argument in turn.

¶ 47    First, we reject defendant's contention that his sentence was excessive. "[T]he trial court is in the best position to fashion a sentence that strikes an appropriate balance between the goals of protecting society and rehabilitating the defendant." *People v. Risley*, 359 Ill. App. 3d 918, 920 (2005). Thus, we may not disturb a sentence within the applicable range unless the trial court abused its discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). A sentence is an abuse of discretion only if it is at great variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Id.* at 210.

¶ 48    Defendant does not provide any authority to support his argument. Instead, he relies on conclusory statements that the jury's verdict "seemed to find" that he did not intend to kill the victim and that the evidence demonstrated that he was "poorly equipped and truly incapable" of helping the victim with her mental-health issues. Accordingly, this argument is forfeited for want of development. See *People v. Haissig*, 2012 IL App (2d) 110726, ¶ 17 (argument forfeited for lack of development, pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008)). In any event, based on our review of the record, we see no abuse of discretion in the trial court sentencing defendant to 8 years' imprisonment when the sentencing range was 3 to 14 years' imprisonment. See 720 ILCS 5/9-3(f) (West 2012); *People v. Gold*, 221 Ill. App. 3d 187, 190 (1991) (holding that the trial court did not abuse its discretion in sentencing the defendant to an extended term of 10 years' imprisonment for involuntary manslaughter).

¶ 49    Second, defendant's argument that the trial court erred in refusing to grant him credit for the time that he spent on electronic monitoring before trial is misplaced. Citing section 5-4.5-100(b) of the Unified Code of Corrections (730 ILCS 5/5-4.5-100(b) (West 2012)), defendant notes that home confinement is defined as the "confinement of a person convicted or charged with an offense to his *** place of residence under the terms and conditions by a supervising authority."

¶ 50    In *People v. Smith*, 2014 IL App (3d) 130548, the reviewing court considered whether the defendant, who was released on bond and subject to a GPS-monitoring device during the pendency of his direct appeal, was entitled to a credit. *Id.* ¶¶ 4-5. Interpreting section 5-4.5-100, the court concluded that "home confinement pursuant to an appeal bond does not qualify as custody entitling one to credit against his sentence under the statute." *Id.* ¶ 35 (discussing *People v. Beachem*, 229 Ill. 2d 237, 243 (2008), and the conditions afforded someone released on bond, including the ability to challenge the conditions of release). We agree with the reasoning in *Smith* and conclude that because defendant was released on bond

- 11 -

while being subject to electronic monitoring, the trial court did not err in refusing to give him a credit.

¶ 51　　Finally, citing *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151 (2013), defendant argues that the trial court improperly enhanced his sentence without a proper jury finding that the victim was a member of the family or household, a necessary element of the offense of involuntary manslaughter of a family or household member (see 720 ILCS 5/9-3(f) (West 2012)). The State concedes that the enhancement factor should have been presented to the jury as an element of the offense. However, the State cites *People v. Thurow*, 203 Ill. 2d 352 (2003), and argues that the error was harmless.

¶ 52　　We are persuaded by the State's argument. In *Thurow*, our supreme court held that harmless-error review applied when a jury, as opposed to a trial judge, should have determined whether the victim was a household member. The proper test is, " '[i]s it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " *Id.* at 368-69 (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)). The *Thurow* court concluded that the evidence in support of the omitted element was "uncontested and overwhelming" and that therefore the failure to instruct the jury was harmless. *Id.* at 369. Similarly, in this case, the evidence that the victim was a member of defendant's family and household was uncontested and overwhelming. It was undisputed that defendant and the victim were married, and testimony reflected that they were "a very loving couple." Thus, the trial court's error in failing to submit to the jury that element of the offense of involuntary manslaughter of a family or household member was harmless.

¶ 53　　　　　　　　　　　　　　　　III. CONCLUSION

¶ 54　　For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 55　　Affirmed.