26 January 2000

NO. 4-98-1055

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from

Plaintiff-Appellant, ) Circuit Court of

v. ) Vermilion County

CAMERUN BLAYLOCK, ) No. 93CF502

Defendant-Appellee. )

) Honorable

) Dale A. Cini,

) Judge Presiding.

JUSTICE KNECHT delivered the opinion of the court:

In December 1993, the State charged defendant, Camerun Blaylock, with five counts of murder (720 ILCS 5/9-1(a)(1) through (a)(3) (West 1992)) and six counts of home invasion (720 ILCS 5/12-11(a)(1), (a)(2) (West 1992)), all stemming from the December 1993 murder of Robin Jackson.  In January 1995, a jury returned a verdict of guilty on the home invasion counts but was hopelessly deadlocked on the murder counts
.  In January 1996, the trial court sentenced defendant to a 30-year term on the home invasion conviction
, and this court affirmed that judgment on direct appeal.  
People v. Blaylock
, No. 4-96-0123 (February 2, 1998) (unpublished order under Supreme Court Rule 23).

In the meantime, in January 1995, the State moved to 
retry Blaylock on the murder counts, and in March 1995, the trial court granted the motion.  In April 1995, defendant filed a motion to dismiss the murder charges on double jeopardy grounds.  In April 1995, the trial court denied the motion, defendant appealed, and this court affirmed.  
People v. Blaylock
, No. 4-95-

0381 (December 26, 1997) (unpublished order under Supreme Court Rule 23).  Later, the circuit court clerk's office determined all the exhibits admitted in the original trial, except for the gun, bullets, and bullet casings stored in the safe, had been lost by the clerk's office.  In October 1998, Blaylock filed a motion to dismiss the murder indictment, arguing retrying him without the lost exhibits deprived him of due process of law.  In December 1998, the trial court granted Blaylock's motion.  The State appeals, arguing retrying defendant without the exhibits does not deny him due process of law because the State did not lose the evidence in bad faith.  We reverse and remand.

I. BACKGROUND

In December 1993, Blaylock was indicted on five counts of first degree murder and six counts of home invasion.  Blaylock's trial took place from January 11 to 18, 1995.

A. Evidence Adduced at January 1995 Trial

Kimberly Jackson, wife of the victim, Robin Jackson, testified she, her husband, and their four children were at their home in Tilton the evening of December 15, 1993.  At approxi

mately 7:45 p.m., she and the children went to bed.  She later awoke due to a "pop" sound, jumped out bed, and looked into the living room, where she saw a man stooping over her husband.  After she screamed, the man jumped back and ran out the door.  Kimberly identified the man as black, "medium-tall, about five-

five," wearing a dark grayish-blue coat, with a stocking cap on the top of his head, and having smooth, flat, or short hair where the cap ended at about mid-ear.  She also testified she knew defendant Blaylock, but could not tell if he was the man she saw at her house on December 15, 1993.

Ranterris Landfair testified he knew defendant Blaylock and Arnell Render, a codefendant, and in the past he had borrowed Blaylock's car.  On December 15, 1993, Blaylock told Landfair he had something he wanted him to do.  Later that day, Blaylock and Render picked Landfair up in Blaylock's car and the three men drove to Tilton.  At one point, Blaylock stopped the car and retrieved a "shiny item" from the trunk.  Render also exited the car, and Blaylock told Landfair to park at a nearby tavern and wait for Blaylock and Render to return.  About 20 minutes later, Blaylock and Render ran toward the car yelling, "Go."  While Landfair drove, defendant Blaylock stated, "You see how I popped him twice in the chest," and Render stated, "I stabbed him twice."  Blaylock and Render also undressed and threw the clothes and shoes they were wearing out the car window.  Render told Landfair to stop, and Blaylock exited the car and threw the gun. Landfair then continued to drive. 

Landfair also testified he told the police defendant Blaylock was wearing a jacket (defendant's exhibit No. 10) and a pair of boots (People's exhibit Nos. 36 and 39) on December 15, 1993.  During Landfair's testimony, Blaylock put on the jacket and the left boot.  Blaylock's attorney pointed out to the jury Blaylock had difficulty putting the boot on and the arms of the jacket were short.  Landfair also put the jacket on and the record reflected the jacket fit him. 

Render testified he was charged with murder and home invasion.  He received a 45-year sentence after pleading guilty to murder on the condition that he testify against Blaylock.  He admitted (1) receiving social security checks for disabilities he falsely claimed and (2) prior convictions for possession of a stolen motor vehicle and theft of a motor vehicle, residential burglary, and obstruction of justice. 

Render testified Blaylock told him he wanted a person named Robin "dealt with" and he (Render) agreed to go with Blaylock to Robin's home for $500.  Render and Blaylock picked up Landfair, who was to drive Blaylock's car.  After Blaylock retrieved a gun from the trunk, he and Render went to Robin's home.  

Render kicked in the front door of Robin's home, entered, and stabbed Robin twice with a jagged-edged knife.  Blaylock pushed Render aside and shot Robin twice.  As Render left the home, he heard a third shot.  Render and Blaylock ran to the car and told Landfair to go.  As they drove, Render and Blaylock threw the clothes and shoes they were wearing out the car window.   After  stopping briefly, Blaylock threw the gun "somewhere."  While in the car, Render stated, "I couldn't believe that I stabbed him." 

Render also testified he wore a size 10½ shoe and wore his hair at the time of the killing "cut so that it's almost like shaved from above the ear on down the back of the neck."  
He also acknowledged he wrote his girlfriend, Dechelle Gentry, a four-page document while he was in prison in which he wrote, "My crime is worser [
sic
] and I took a life."  However, he denied killing Robin and stated he was not referring to Robin's death in the document.  The trial court allowed only the last page of the document into evidence, finding lack of foundation for the other three pages.

Dechelle Gentry testified she lived with Render at the time the crime occurred.  She stated Render returned the night of December 15, 1993, and told her "I just killed a man."  She also identified the brown leather shoes (People's exhibit Nos. 36 and 39) as Render's shoes.  Render also sent her a document from prison that included an admission by Render.

Dr. Sharon Schnittker, who conducted the autopsy, opined Robin's death was caused by massive hemorrhage due to three gunshot wounds. 

During the trial, the State had 59 exhibits admitted into evidence and Blaylock had 33 exhibits admitted into evi

dence.  The items admitted into evidence included (1) the cloth

ing retrieved from Tilton and which had been thrown out the car window; (2) the back page of the document Render wrote while in prison; (3) the gun, bullets, the shoes that had been thrown out the car window; and (4) the shoes Blaylock wore at the time of his arrest. 

During closing arguments, Blaylock argued, in part, he should not be found guilty because the State's two main wit

nesses, Landfair and Render, could not be believed and he was not involved in the crime.  This was evidenced by the impeachment of the witnesses and the exhibits admitted into evidence, including the jacket and shoes that did not fit defendant (while  the jacket did fit Landfair).  Defendant's theory was that they fit Landfair, and defendant was not at the scene of the crime.  The jury found Blaylock guilty of home invasion and hopelessly deadlocked on the first degree murder charges.  Blaylock was sentenced to 30 years in prison with credit for 758 days served. 

B. Posttrial Events

In January 1995, the State asked the trial court for permission to retry Blaylock for first degree murder.  The State's request was granted.  In April 1995, the trial court denied Blaylock's motion to dismiss the first degree murder charges based on double jeopardy, and as stated, in December 1997, this court affirmed.

In July 1998, Blaylock submitted discovery requests seeking evidence admitted in the first trial.  Blaylock also filed a motion for forensic laboratory testing of clothing removed from the victim and recovered from the crime scene.  In October 1998, the motion was denied because the evidence was not available.   In October 1998, after learning the clerk's office lost all of the exhibits admitted into evidence at the previous trial except the gun, bullets, and bullet casings, Blaylock filed a motion to dismiss arguing retrying him without the lost exhib

its deprived him due process of law. 

In December 1998, a hearing was held on Blaylock's motion to dismiss.  At the hearing, circuit clerk Sally Armes testified all of the exhibits from the previous trial, except the gun, bullets, and bullet casings stored in a safe, had been lost by the clerk's office.  Armes testified the box containing all the other exhibits was placed in the jury room the day of Blaylock's sentencing hearing.  The box was not returned to the basement for storage and the clerk's office had not been able to find the box after an extensive search. 

At the hearing, Blaylock argued he would be deprived of due process of law if he was tried without the lost exculpatory evidence.  This evidence included clothing retrieved from the crime scene, the shoes defendant wore at the time of arrest, and the document Render wrote to his girlfriend containing an admis

sion.  Blaylock argued this evidence could not be replaced with other evidence and it was exculpatory because it was used to impeach the State's witnesses and to show Blaylock may not have been at the crime scene.  He also argued he believed he could lay the proper foundation to have the entire document Render wrote containing the admission admitted at the new trial.  Last, he argued the bad-faith requirement of 
Arizona v. Youngblood
, 488 U.S. 51, 57-58, 102 L. Ed. 2d 281, 289, 109 S. Ct. 333, 337 (1988), did not apply to the present case because the presenta

tion of the evidence in open court is analogous to an exception to the bad-faith requirement
 if the defense has moved for produc

tion of pertinent evidence before it was destroyed.

The State argued bad faith must be shown, Blaylock failed to show any bad faith, and the missing evidence was not clearly exculpatory. 

The trial court found the missing evidence was "criti

cally important" to Blaylock
 and granted Blaylock's motion.  The trial court found Blaylock did not need to demonstrate bad faith by the State.  The trial court distinguished this case from 
Youngblood
 and 
In re C.J.
, 166 Ill. 2d 264, 652 N.E.2d 315 (1995), as (1) this case did not involve the inadvertent failure to preserve evidence
 or the routine disposal of evidence, and (2) the evidence in this case was reasonably ascertainable.  This appeal followed. 

II. ANALYSIS

The State argues the trial court was required to find bad faith on its part to find a violation of Blaylock's due process rights.  We agree and reverse the trial court's dismissal of the indictment.

The standard of review on a ruling on a motion to dismiss an indictment is whether the trial judge was correct as a matter of law.  
People v. Cora
, 238 Ill. App. 3d 492, 504, 606 N.E.2d 455, 463 (1992).
 

The duty imposed on the State to preserve evidence is limited to evidence expected to play a significant role in a defendant's defense.  The evidence must possess "an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  
California v. Trombetta
, 467 U.S. 479, 489, 81 L. Ed. 2d 413, 422, 104 S. Ct. 2528, 2534 (1984).  In addition, the failure to preserve potentially useful evidence does not constitute a denial of due process unless the defendant can show bad faith on the part of the State.  
Youngblood
, 488 U.S. at 58, 102 L. Ed 2d at 289, 109 S. Ct. at 337.

In 
C.J.
, the Supreme Court of Illinois applied the holding of 
Youngblood
, 
finding a defendant's due process rights were not violated after a report from the Department of Children and Family Services (DCFS) was destroyed by a DCFS investigator prior to trial.  
C.J.
, 166 Ill. 2d at 275, 652 N.E.2d at 320.
  The court found no evidence showed the DCFS investigator func

tioned as an aid to the prosecution, and the responsibility for the destruction of the report could not be
 imputed to the State.  
Finding no bad faith on the part of the State, the court reversed the dismissal of the defendant's petition.  
C.J.
, 166 Ill. 2d at 270-74, 652 N.E.2d at 318-20.

In
 
People v. Rhodes
, 243 Ill. App. 3d 701, 612 N.E.2d 536 (1993),
 this court found
 a 
defendant was not denied due process when he did not have the first written statement of a witness, which was destroyed by a police officer.  Citing 
Youngblood
, we found defendant had to show bad faith by the State.  
Rhodes
, 
243 Ill. App. 3d at 704, 612 N.E.2d at 539
; 
cf
. 
People v. Coleman
, 307 Ill. App. 3d 930, 936, 718 N.E.2d 1074, 1078 (1999) (showing of bad faith was not necessary because police destroyed alleged cocaine after defendant filed discovery motion seeking the alleged cocaine).

In a case factually similar to this case, the First District Appellate Court required a finding of bad faith before concluding the dismissal of defendant's case was proper.  
People v. Walker
, 257 Ill. App. 3d 332, 628 N.E.2d 971 (1993).  In 
Walker
, evidence inventoried by the police, including a plastic knife, jacket, knife, grey suit, and pair of leather gloves, was destroyed.  After the jury returned a deadlocked verdict result

ing in a mistrial, the trial court granted the defendant's motion to dismiss the indictment on due process grounds.  The appellate court affirmed, finding in part that the
 destruction of the evidence by the police six weeks after arrest was not in good faith.  
Walker
, 257 Ill. App. 3d at 335-36, 628 N.E.2d at 973-74;
  see also 
Fields v.
 United States
, 698 A.2d 485, 489 (App. D.C. 1997) (finding no due process violation after clerk's office lost exhibits during jury deliberations
 because no showing of bad faith or fault on the part of the prosecution was made); 
State v. Jefferson
, 938 S.W.2d 1, 16 (Tenn. Crim. App. 1996) (finding no due process violation after clerk purged exhibits before defen

dant's retrial because the lost items were not in the State's possession and no showing of bad faith on the part of the State was made); 
State v. Lindsey
, 543 So. 2d 886, 890-91 (La. 1989)
 (upholding denial of defendant's motion to quash indictment after clerk's office lost photographs because no showing of bad faith by the State was made); 
State v. Vickers
, 180 Ariz. 521, 528, 885 P.2d 1086, 1093 (1994) (rejecting defendant's argument that bad-

faith requirement does not apply when evidence is destroyed after a verdict is rendered).

In this case, the parties do not dispute the loss of evidence did not involve bad faith by the State.  The trial court granted Blaylock's motion to dismiss, finding Blaylock did not have to show the lost evidence resulted from bad faith by the State.   The trial court distinguished this case from 
Youngblood
 and 
C.J.
, as (1) this case did not involve either the inadvertent failure to preserve evidence (as did 
Youngblood
) or the routine disposal of evidence (as did 
C.J.
) and (2) the evidence in this case was reasonably ascertainable.  
While we agree with this analysis by the trial court,
 we disagree with the trial court's conclusion these facts establish Blaylock was deprived of due process without a need to show bad faith by the State.  See 
Youngblood
, 488 U.S. at 58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337; 
C.J.
, 166 Ill. 2d at 273-74, 652 N.E.2d at 320; 
Rhodes
, 243 Ill. App. 3d at 704, 612 N.E.2d at 539.
  
We find the trial court improperly granted Blaylock's motion to dismiss the indictment because the loss of evidence occurred in the absence of bad faith by the State.

III. CONCLUSION

We reverse the trial court's judgment and remand for further proceedings­.

Reversed and remanded.

STEIGMANN and MYERSCOUGH, JJ., concur.