2016 IL App (1st) 133814

No. 1-13-3814

Fourth Division
February 18, 2016

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 12 CR 16867-02 |
| v. | ) ) | |
| | ) | Honorable |
| DONNIE MOORE, | ) ) | Kenneth J. Wadas, Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Donnie Moore was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2012)). The trial court sentenced defendant to 50 years for the first degree murder conviction, with an additional 25 years for the discharge of a firearm, and then 30 years for the attempted murder conviction, with an additional 20 years for the firearm enhancement, for a total of 125 years in prison. Defendant appeals the judgment and sentence of the trial court and contends that: (1) the trial court's denial of his motion to dismiss after the State failed to preserve identification evidence was a mistake as a matter of law; (2) the

trial court's refusal to bar testimony based on evidence that the State failed to preserve was an abuse of discretion; (3) the trial court's admission of evidence from codefendant Eddie Fenton's confession was an abuse of discretion; (4) the trial court's refusal to allow testimony of a witness's coercion was an abuse of discretion; and (5) no reasonable trier of fact could find that the evidence presented at trial could prove guilt beyond a reasonable doubt.

¶ 2                                                    I. BACKGROUND

¶ 3        A grand jury indicted defendant and codefendant Eddie Fenton[1] with one count of second degree murder, five counts of first degree murder and five counts of attempted first degree murder for the death of Jonathan Bowman and for the gunshot wound suffered by Patrick Collier, also known as Patrick Bullock. Defendant's and codefendant's cases were tried separately.

¶ 4        Prior to trial, defendant filed a motion for sanctions alleging that the State committed discovery violations when it failed to preserve certain photo arrays. Specifically, defendant alleged that the photo array shown to Rhonda Scott in 2006, from which she identified defendant, and the photo array shown to Charles Richardson in 2007, from which he did not identify defendant, were lost or destroyed and therefore testimony involving these arrays should be barred. Defendant further argued that because the photo arrays were missing, he was denied the opportunity to confront the witnesses against him and due process was violated. The court denied the motion. In so ruling, the court stated that the missing evidence "does not warrant a dismissal of the indictment. By the same token, it does not warrant a jury instruction that allows the State to infer that [defendant's] photo was in the array. *** But the Defense is entitled to the standard instruction relating to lost evidence in the care and custody

---

[1] Codefendant is not a party to this appeal.

of the police department allowing a negative inference to be drawn from the missing evidence and the opportunity for the Defense to argue that any reasonable inference that can be drawn from the missing evidence. So I'm not really imposing a sanction."

¶ 5 The following facts were adduced at trial. On January 8, 2006, defendant and some of his friends threw a party at a house owned by codefendant's sister, Kewana, located at 7325 South Morgan Street in Chicago, Illinois. Kewana had recently moved to the neighborhood and the party's hosts were primarily from a different, but nearby, neighborhood. Defendant, codefendant, Anthony Butler, and Nathaniel Whiteside purchased liquor and hired a DJ for the party. Guests were searched for guns and charged a fee to enter, however, only local people were actually searched. The party was crowded, with people shoulder to shoulder, making it difficult to move. There were people standing in front of the house and down the block, some of whom were outside because they did not want to be searched or pay to get in.

¶ 6 Butler identified defendant in court. He testified that at some point, a fight broke out in front of the house. He saw his friend on the ground and Butler assumed that his friend had been hit by an individual, who was later identified as Bowman, walking away. Butler ran out of the house and punched Bowman in the face, knocking him to the ground. Then three to four people began jumping on Bowman, who was curled into a ball. Codefendant ran out of the house, parted the crowd, and fired six or seven shots into Bowman. Butler then ran to the corner of Morgan Street and 74th Street to check on the women he came to the party with. He heard more gun shots as he ran away. About 5 to 10 minutes later, Butler saw defendant in the alley at the corner waving a golf club at local people who were trying to "make a move" on defendant. Soon after, the police arrived and broke up the fight.

¶ 7        Collier testified that he was in the area on the night of the shooting because he lived nearby. Bowman, Collier, and Collier's cousin had a drink in Collier's car about half a block down from the party. They saw that there was a party going on and decided to go to it. When they arrived, Collier and his cousin were searched and initially charged $5 to get in but the price was eventually lowered to $2. Bowman did not come into the house with them. Collier and his cousin made it halfway through the first level, but about 10 minutes later they decided to leave because it was too crowded. When they made it out the front door, Collier saw five or six guys kicking and beating a guy on the ground in front of the house next door. At that point, Collier was unable to see the person on the ground. Collier began to walk around the beating and into the street to get to his car. Then he saw two people start shooting into the guy on the ground. He was only able to see the shooter facing him, whom he identified as codefendant. At some point, Collier recognized Bowman as the man on the ground. Codefendant turned around and said something to Collier and then codefendant shot Collier. Codefendant aimed for Collier's face, but Collier put his arm up as a shield and was shot in the forearm. Collier ran to his car about four houses away. Collier's cousin made it to the car and his cousin drove him to St. Bernard Hospital. Subsequently, Collier was transferred to Mt. Sinai Hospital, where he had surgery on his arm for the gunshot wound.

¶ 8        Richardson identified defendant in court as one of the shooters who shot Bowman. He testified that he lived two houses down from Kewana's house at 7321 South Morgan Street. On the night of January 8, 2006, Richardson was sitting in a car in front of Bowman's house, which was also on the 7300 block of South Morgan Street, socializing with Bowman and Parnell Williams. They observed a party down the street. Richardson left the car and went into his house to take a shower and Bowman remained outside. After he got into the shower,

he heard gunshots. He jumped out of the shower, ran down the stairs, and looked out the window. He saw Bowman trying to get into his car. Richardson also saw people running from the party and two people shooting at Bowman. Richardson yelled at Bowman, telling him to get out of the street. Then, the shooters started shooting at Richardson's house. Richardson ducked down and went back inside. He told his fiancée to take the kids upstairs and put them on the floor. A bullet hit the fence in front of his house. Richardson went back on to the porch and heard defendant say that Bowman was "going to die tonight." Richardson saw Bowman lying halfway in the street and halfway out of the street. A car then pulled up and Collier jumped out and tried to pull Bowman in but Collier was shot in the arm. Richardson testified that a shooter told Collier to let Bowman go because he was "dying tonight." Then, the car drove off. A third shooter came down the street shooting. One of the shooters' guns jammed, the shooter popped the clip out, put another one in, and shot two shots into Bowman. The shooters ran away and Richardson went down and dragged Bowman out of the street. The police arrived and then the paramedics arrived and transported Bowman to Christ Hospital. He died from his injuries on January 12, 2006.

¶ 9 Whiteside identified defendant in court. He testified that he planned the party with codefendant and defendant. At some point in the night, a fight broke out in front of the house. Codefendant's two sisters were fighting with someone who lived on the 7300 block of South Morgan Street. Whiteside further testified that codefendant "was shooting when he came out of the gate and then he ran over there and shot." Bowman then fell to the ground in the street between the cars and then defendant ran past and shot at him three or four times. After hearing the first gunshots, people were scattering from the party. Whiteside shot twice into

the air to defend himself and ran to his car. Then, codefendant and defendant ran inside the house. Eventually, the police arrived but Whiteside did not stay to talk to them.

¶ 10        Rhonda Scott identified defendant in court. She testified that she was 12 years old on January 8, 2006. She went to the party with her sister and some friends. She had been at the party for a couple of hours when a fight broke out outside. She heard gunshots and dropped to the ground. When the first gunshots stopped, she left through the front door of the house. She ran towards the gangway to try to find her sister. As she was running, she saw codefendant running out of the gangway and shooting at a person. Eventually, she met up with her sister and a male friend in the street in front of the house. They ran to the car they arrived in and kneeled down beside the car. Scott saw a few people with guns, including Whiteside, whom she knew, reloading his gun. As she knelt beside the car, she heard more gun shots. Then, defendant approached them with a gun and asked her male friend "who he was with." The guy responded that "I'm not with them. I'm with you all" and got up and ran. Defendant shot at him approximately five times. Then Scott and her sister ran to a house and tried to get in, but no one answered, so they stayed on the porch until the police arrived.

¶ 11        At trial, Scott was wearing Department of Corrections clothing. She testified that she was arrested for failing to come to court to testify in this case. She had no other pending cases against her. On cross-examination, defense counsel asked Scott if she had asked for a lawyer when she was arrested and the assistant State's Attorney objected. The court sustained the objection. Defense counsel then asked Scott if she was told that her children could be taken away if she did not testify. The State objected arguing that there was no good faith basis for the defense's questions. The State also argued that the defense would not be able to prove up these assertions if it intended on impeaching Scott. The court agreed that without a witness to

impeach Scott by testifying that she was coerced, there was no way for defense counsel to prove up this line of questioning. Despite this ruling, defense counsel asked Scott if anyone threatened her and she responded that she was not threatened.

¶ 12     Detective Anthony Powell testified that an initial investigation commenced soon after Bowman's death. Detective Powell further testified that he interviewed Scott in February 2006. She was shown a photo array with codefendant and defendant. She identified codefendant as the person she saw shoot Bowman. She also identified defendant as the person who approached her group with a gun. This photo array was not preserved and, thus, was not available at trial. Detectives attempted to interview Scott again several times and bring her in for a physical lineup identification of codefendant; however, Scott was a minor and her mother would not allow her to speak to the detectives. Detective Powell also interviewed Collier in 2006. Collier was shown a photo array, which included defendant but did not include codefendant, and was not able to make an identification. This photo array was also not available at trial.

¶ 13     In early 2007 the case "went cold," which Detective Powell explained occurs when there are no leads or investigative facts after one year. The detectives decided to reopen the case in May 2007. On May 12, 2007, Collier was shown another photo array and he identified codefendant as a shooter from that array. He did not identify defendant. This photo array is missing and was not available at trial. After Collier identified codefendant, codefendant was arrested for the homicide and Collier identified him in a physical lineup. Richardson was shown a photo array on May 18, 2007, but he was unable to make an identification. This array was missing and was not available at trial. On May 19, 2007, Collier stopped

cooperating with the detectives and the case again "went cold" and was transferred to the cold case squad.

¶ 14    Detective Powell testified that the investigation was reopened by the cold case squad in 2011. On August 3, 2011, Collier identified codefendant as the person who shot Bowman and who shot him in the forearm. Detective Oscar Arteaga testified that he spoke to Richardson on March 16, 2012. At that time, Richardson identified both codefendant and defendant as the individuals who shot Bowman. In April 2012, Detective Arteaga received information from an informant to speak to Butler and Detective Arteaga spoke to him on May 8, 2012. On June 19, 2012, codefendant was arrested for the murder. Thereafter, on August 27, 2012, defendant was arrested for the murder. Three days later, Whiteside was also arrested, however, he was subsequently cleared of the murder.

¶ 15    During cross-examination, defense counsel suggested that Detective Arteaga did not have more evidence regarding defendant's involvement with the murder in 2012 than he had in 2006. The State objected. In a sidebar, the State argued that defense counsel's questioning opened the door for Detective Arteaga to testify about codefendant's confession, which provided more information to the detectives about defendant's role in the murder. The State argued:

"MR. DAVEY [Assistant State's Attorney]: Judge, Detective Arteaga also talked to Eddie Fenton —

THE COURT:  Right.

MR. MORELY:  Who confessed to this case.

* * *

MR. MORELY:  *** He is saying there is no more evidence, there is more evidence.

- 8 -

THE COURT: Absolutely. Completely opened by the Defense.

* * *

THE COURT: Right now the jury thinks there's no other physical piece of evidence.

* * *

THE COURT: Absolutely. Conducting a balancing test, the probative value, the jury is left right now with the idea that there's nothing else for this detective to charge Donnie Moore than what he knew back in 2006. And there's a big thing that came up later on down the line, Eddie Fenton's confession."

¶ 16    The court then directed the State not to present the substance of codefendant's confession, but allowed Detective Arteaga to testify, over defendant's objection, to the fact that codefendant made a statement to the police about the incident that led to the detectives' decision to arrest defendant. The State rested and defendant motioned to dismiss the indictment and, in the alternative, for a directed verdict. Defendant again argued that the case should be dismissed because his due process rights were violated by the missing photo arrays. He also argued that there should be a directed verdict because the State did not meet its burden of proving him guilty beyond a reasonable doubt. The court denied both motions. After admitting stipulated evidence into the record, the defense rested.

¶ 17    Prior to deliberations, the jury was admonished with Illinois Pattern Jury Instructions, Civil, No. 5.01 (2000), which provides:

"If a party to this case has failed [to offer evidence] *** within his power to produce, you may infer that the [evidence] *** would be adverse to that party if you believe each of the following elements:

1. The [evidence] *** was under the control of the party and could have been produced by the exercise of reasonable diligence.

2. The [evidence] *** was not equally available to an adverse party.

3. A reasonably prudent person under the same or similar circumstances would have [offered the evidence] *** if he believed [it to be] *** favorable to him.

4. No reasonable excuse for the failure has been shown."

¶ 18    The jury found defendant guilty of first degree murder and attempted first degree murder and further found that a firearm was discharged in the commission of both offenses. Subsequently, defendant was sentenced to 50 years in prison for first degree murder with a 25 year enhancement for using a firearm and 30 years for the attempted murder conviction with a 20 year enhancement for using a firearm, for a total of 125 years. Defendant filed a motion for a new trial contending that the State failed to prove him guilty beyond a reasonable doubt, the verdict was against the manifest weight of the evidence, and that he was denied due process of law. The court denied the motion.

¶ 19                                   II. ANALYSIS

¶ 20                               A. Motion to Dismiss

¶ 21                     1. Dismissal for Alleged Due Process Violation

¶ 22    Defendant contends that the trial court erred in denying his motion to dismiss after the State failed to preserve identification evidence. Specifically, defendant argues that the lost photo arrays were essential and determinative of the case, and therefore the case must be dismissed. The State responds that the court did not err in denying the motion.

¶ 23     Initially, we note that a discovery violation can be analyzed under either the due process clauses of United States (U.S. Const., amends. V, XIV) and State Constitutions (Ill. Const.

1970, art. 1, § 2) or under Illinois Supreme Court Rule 415(g)(i) (eff. Oct. 1, 1971). *People v. Stolberg*, 2014 IL App (2d) 130963, ¶ 25. Here, defendant argues both that his right to due process was violated and that dismissal was the appropriate sanction. We first address the alleged due process violation. A decision to deny a motion to dismiss for an alleged due process violation resulting from a failure to preserve evidence is reviewed *de novo. People v. Blaylock*, 311 Ill. App. 3d 399, 404 (2000). Defendant relies on *People v. Newberry*, 166 Ill. 2d 310 (1995), to argue that the State's failure to preserve the photo arrays violated his due process rights. We find it helpful to review *Newberry* within its context in the development of case law regarding the State's obligation to preserve potentially exculpatory evidence.

¶ 24 The United States Supreme Court addressed this issue in *California v. Trombetta*, 467 U.S. 479 (1984). In that case, the defendants were suspected of driving under the influence of alcohol and breath samples were collected. *Id.* at 482. Subsequent to obtaining a blood alcohol level reading, the breath samples were destroyed. *Id.* at 482-83. The defendants were charged with driving under the influence and they moved to suppress the breath-analysis test results based on the State's failure to preserve the samples. *Id.* at 482. The United States Supreme Court ruled that due process was not violated because the police officers acted in good faith and in compliance with normal procedures. *Id.* at 488-89. The Court noted that the testing device had a high degree of accuracy and it was unlikely that further testing of the samples would have aided the defense. *Id.* at 489. The Court further explained that the defendants had alternative means of demonstrating their innocence. *Id.* at 490.

¶ 25 The United States Supreme Court provided further guidance in *Arizona v. Youngblood*, 488 U.S. 51 (1988). In *Youngblood*, the defendant was convicted of child molestation, sexual assault, and kidnapping. *Id.* at 52. The defendant argued that, pursuant to *Brady v. Maryland*,

373 U.S. 83 (1963), the State was required to preserve semen samples on clothing and make them available to the defendant. *Youngblood*, 488 U.S. at 55. The State had failed to preserve the samples, and the Arizona Court of Appeals reversed the conviction because of the missing evidence. *Id.* The United States Supreme Court reversed the Court of Appeals. *Id.* at 57-59. In doing so, it reasoned that when the missing evidence is not inherently exculpatory but merely "could have been subjected to tests, the results of which might have exonerated the defendant," or is only "potentially useful," the defendant is required to show that the State acted in bad faith. *Id.* at 57-58. The Court further explained that it was unwilling to find that the due process clause imposes a duty on the police to preserve all evidence that "might be of conceivable evidentiary significance." *Id.* at 58.

¶ 26    In *People v. Newberry*, 166 Ill. 2d 310 (1995), our supreme court examined whether the failure to preserve cocaine was a due process violation. *Id.* at 314. In that case, the defendant was arrested and the police seized a substance from him that they thought was cocaine. *Id.* at 311-12. The initial test came back negative, and consequently he was indicted for unlawfully possessing a look-alike substance with intent to distribute. *Id.* at 312. A later laboratory test returned positive results for cocaine. *Id.* Thereafter, the defendant was indicted with charges related to the possession of cocaine and the initial charges were nol-prossed. *Id.* The defendant's attorney filed a discovery motion requesting, *inter alia*, to examine all tangible objects that were seized from the defendant. *Id.* However, due to a mistake at the police department, and with no bad faith, the substance had been destroyed. *Id.* at 313. The defendant alleged that the missing evidence was a due process violation and the supreme court agreed. *Id.* at 317. In ruling, the court distinguished both *Trombetta* and *Youngblood*. *Id.* at 314-17. The court noted that in contrast to *Trombetta*, the test results were not

especially reliable. *Id.* at 316. Additionally, the court concluded that, unlike in *Youngblood*, the destroyed evidence was "essential to and determinative of the outcome." *Id.* at 315. The court found it significant that without being able to test the substance, the defendant lacked other means of demonstrating that he was not guilty. *Id.* at 316. The court also reasoned that because the defendant made a discovery request, the State was on notice that the evidence needed to be preserved. *Id.* at 317. Therefore, the defendant was not required to show that the State acted in bad faith in destroying the evidence. *Id.* The court held that his due process rights had been violated and that the charges must be dismissed. *Id.*

¶ 27    The United States Supreme Court revisited the issue in *Illinois v. Fisher*, 540 U.S. 544 (2004), and clarified the due process analysis under the fourteenth amendment to the United States Constitution. In *Fisher*, the Illinois Appellate Court, following *Newberry*, dismissed the defendant's criminal charges because the police, acting in good faith, destroyed evidence that the defendant had requested 10 years earlier. *Id.* at 545. The United States Supreme Court expressly disagreed with the reasoning in *Newberry*. *Id.* at 546. The court emphasized that, "[w]e have never held or suggested that the existence of a pending discovery request eliminates the necessity of showing bad faith on the part of police." *Id.* at 548. The court further stressed that, "[w]e also disagree that *Youngblood* does not apply whenever the contested evidence provides a defendant's 'only hope for exoneration' and is 'essential to and determinative of the outcome of the case.' " *Id.* (quoting *Newberry*, 166 Ill. 2d at 315). The United States Supreme Court explained:

  "the applicability of the bad-faith requirement in *Youngblood* depended not on the

    centrality of the contested evidence to the prosecution's case or the defendant's defense,

but on the distinction between 'material exculpatory' evidence and 'potentially useful' evidence. [Citation.]" *Id.* at 549.

The Court concluded that the evidence in that case was only potentially useful and not material and exculpatory. *Id.* The Court also found that the defendant had not made a showing of bad faith. *Id.* Because the defendant had not done so, the case was reversed and remanded. *Id.*

¶ 28    Our supreme court has not addressed whether *Fisher*'s holding affects this court's due process analysis under the Illinois Constitution. Consequently, it is unclear whether *Fisher* or *Newberry* governs. See *People v. Sutherland*, 223 Ill. 2d 187, 240 (2006) (contemplating "whether the outcome-determinative analysis adopted in *Newberry* still has vitality in light of the *Fisher* opinion"). Although we do not have further guidance from our supreme court, subsequent to *Fisher*, the appellate court has rejected *Newberry* and followed *Fisher*. See *People v. Kizer*, 365 Ill. App. 3d 949, 960-61 (2006), *People v. Voltaire*, 406 Ill. App. 3d 179, 183 (2010), and *People v. Stolberg*, 2014 IL App (2d) 130963.

¶ 29    In *Kizer*, the court examined in depth the interplay of the federal access-to-evidence cases – *Trombetta*, *Youngblood*, and *Fisher* – with the Illinois case, *Newberry*. *Kizer*, 365 Ill. App. 3d at 956-961. The court concluded that *Fisher* superseded *Newberry* for four reasons: (1) In *Newberry*, the court made no distinction between the federal due process clause and the state due process clause; (2) In *People v. Pecoraro*, 175 Ill. 2d 294, 318 (1997), our supreme court declined to interpret the Illinois due process clause more broadly than the federal due process clause; (3) *Fisher*'s purported purpose was to clarify *Youngblood*, a case which our court has repeatedly followed in assessing due process; and (4) *People v. Caballes*, 221 Ill. 2d 282, 313 (2006), "reaffirmed [our supreme court's] commitment to the 'limited lockstep analysis.' "

*Kizer*, 365 Ill. App. 3d at 961 (quoting *Caballes*, 221 Ill. 2d at 313)). Under that analysis, the court follows the United States Supreme Court's interpretation of federal provisions when interpreting similar state provisions unless the defendant can point to "language in the constitution, or in the debates and the committee reports of the constitutional convention" [Citations.] (Internal quotation marks omitted.) or there are factors unique to Illinois such as a state standard or tradition that calls for a different meaning as demonstrated by long-standing case precedent. *Id.* The court noted that the defendant in that case did not point to any support for a departure from the United States Supreme Court's reasoning. *Id.*

¶ 30        Subsequently, the reasoning in *Kizer* was followed by this court in *Voltaire*, 406 Ill. App. 3d at 183. The court stated, "[w]e agree with *Kizer* that, if confronted with the issue, [our] supreme court would follow *Fisher*. *Newberry* appears to be nothing more than an application of *Trombetta* and *Youngblood*, and the Supreme Court has now clarified that the application of those cases to this situation contradicts the holding in *Newberry*." *Id.* In *Stolberg* this court again noted that our supreme court has not clarified whether *Fisher* supersedes *Newberry*. *People v. Stolberg*, 2014 IL App (2d) 130963, ¶ 28. Ultimately, however, the court followed *Kizer* and *Voltaire* and applied the *Fisher* analysis. *Id.* ¶¶ 28-29.

¶ 31        We also find the reasoning in *Kizer* and *Voltaire* persuasive. Accordingly, we will analyze the facts of this case under the analysis set forth in *Fisher*.  Here, the lost or destroyed evidence at issue are photo arrays from 2006 and 2007 shown to Scott, Collier, and Richardson. Although defendant could not have been convicted without identification evidence, in this case, defendant was identified by several witnesses and the conviction was not solely dependent on the identifications, or lack of identifications, made from these photo arrays. In addition to the 2006 photo array, Scott identified defendant in 2011 and in court at

trial. Further, although Richardson did not make an identification from the 2007 photo array,[2] he identified defendant in 2012 and again at trial. Further, Whiteside, who knew defendant well, identified defendant in 2012 as one of the shooters who shot Bowman, and the photo array he viewed was available at trial.

¶ 32    Defendant points out that the identifications made by Scott, Richardson and Whiteside in 2011 and 2012 occurred approximately six years after the murder, and therefore he argues that they are unreliable. However, the determination of their reliability and the weight that they should be given are questions for the jury, and not for this court. *Sutherland,* 223 Ill. 2d at 217. In light of the other identifications, the photo arrays' availability, without more, would not exonerate defendant. We agree with defendant that if the 2006 array shown to Scott was available he may have been able to challenge the array based on who it included. However it is just as probable, if not more probable, that the array would corroborate Scott's identification and actually inculpate, not exculpate defendant. We also agree that if the 2007 array shown to Richardson included defendant it could have been useful to challenge his testimony. However, if the array did not include him, it would have had little value. We note that Collier never identified defendant from the arrays he was shown in 2006 and 2007 or at trial. He testified, however, that he only saw one of the shooters' faces and it was codefendant's. Therefore, the photo arrays are only potentially useful and not material and exculpatory. Consequently, defendant was required to show that the State acted in bad faith in failing to preserve the photo arrays. There is no evidence to suggest that the State acted in bad faith and defendant concedes this issue. Accordingly, we do not find a due process violation in this case.

---

[2] Because this array was lost or destroyed, it is unknown if defendant was included in that array.

¶ 33    We note that defendant's argument would fail even if *Newberry* controlled. As discussed above, if the photo arrays were available, they would not be sufficient to determine the outcome of this case. The photo arrays were not essential to the State's prosecution or defendant's defense. Notably, defendant had other means to defend himself, including cross-examining the witnesses, arguing that the jury should draw a negative inference from the fact that the photo arrays were missing, and highlighting the length of time between the murder and the other identifications.

¶ 34                    2. Dismissal for Alleged Discovery Violation

¶ 35    Defendant makes the additional argument that the indictment should have been dismissed as a discovery violation pursuant to Illinois Supreme Court Rule 415(g)(i) (eff. Oct. 1, 1971). A defendant does not need to make a showing of bad faith for the court to dismiss the indictment as a sanction. *People v. Kladis,* 403 Ill. App. 3d 99, 105 (2010). Rather, a defendant is only required to show that " 'a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto.' " *Id.* (quoting Ill. S. Ct. R. 415(g)(i) (eff. Oct. 1, 1971)). We review the decision not to impose sanctions for an abuse of discretion. *People v. Kladis*, 2011 IL 110920, ¶ 23. A court abuses its discretion when its decision is " 'fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it.' " *Id.* (quoting *People v. Ortega*, 209 Ill. 2d 354, 359 (2004)).

¶ 36    Here, defendant argued in his motion for sanctions, that the charges should be dismissed because he was unable to defend himself without being able to challenge the accuracy of the missing photo arrays. The court concluded that the arrays were missing due to no fault of the State and that it was not necessary to impose a sanction. The court stated that the loss of the photos:

- 17 -

"does not warrant a dismissal of the indictment. By the same token, it does not warrant a jury instruction that allows the State to infer that [defendant's] photo was in the array. *** But the Defense is entitled to the standard instruction relating to lost evidence in the care and custody of the police department allowing a negative inference to be drawn from the missing evidence and the opportunity for the Defense to argue that any reasonable inference that can be drawn from the missing evidence. So I'm not really imposing a sanction."

¶ 37    Our review of the record reveals that the court considered defendant's argument and determined that a sanction was not appropriate in this case. We note that each of the witnesses who were shown the subsequently missing arrays testified at trial and were subject to cross-examination. Further, the court allowed "the Defense wide latitude to argue any reasonable inference to be drawn from [the] fact" that the photos were not available. Defendant pursued that argument and emphasized to the jury that the photo arrays were missing and that subsequent identifications occurred approximately six years after the murder. In addition, prior to deliberations, the court admonished the jury that it may infer that missing evidence that was within a party's power to produce would have been adverse to that party.

¶ 38    As discussed above, the arrays were only potentially useful and there is no evidence that the photos were missing due to bad faith. The case went cold twice because witnesses refused to cooperate and, therefore, the detectives were working from a file that was approximately six years old. Under these circumstances, we find the court's decision not to impose a sanction but to instead admonish the jury that it was permitted to make a negative inference was reasonable and not an abuse of discretion.

¶ 39                                    a. Photo Array Testimony

¶ 40        Defendant similarly contends that the court erred in refusing to bar testimony of the missing photo arrays. The State argues that the court did not abuse its discretion in allowing this testimony because it was within the court's discretion to not issue a sanction. The State further argues that "the sanction of excluding certain testimony or evidence is disfavored because it does not contribute to the goal of truth-seeking [citation] and is appropriate in only the most extreme situations [citations]." *People v. Scott*, 339 Ill. App. 3d 565, 572-73 (2003). Furthermore, the State maintains that the court's admonishment to the jury was an appropriate measure to ensure that there was no prejudice to defendant.

¶ 41        Defendant relies on *Kladis* to support his proposition that testimony of the missing photo arrays should have been barred. 2011 IL 110920. In *Kladis*, the trial court sanctioned the State for missing video evidence of a traffic stop by prohibiting the State from presenting any testimony of the events that would have been depicted in the video. *Id.* ¶ 9. On appeal, the supreme court initially determined that the video evidence was discoverable in misdemeanor DUI cases. *Id.* ¶ 29. It then applied the abuse of discretion standard to the lower court's sanction and concluded that barring testimony of what was depicted in the video was not an abuse of discretion in that case. *Id.* ¶ 39. Thus, *Kladis* does not stand for the proposition that testimony must be barred whenever there is a discovery violation that results in missing evidence. Instead, it is clear that the trial court has discretion over the appropriate sanction to impose. Here, the court explicitly chose not to impose a sanction. Given the facts of this case, as discussed above, we do not find that the decision not to impose a sanction was an abuse of discretion.

¶ 42                          b. Admission of Evidence from Codefendant's Confession

¶ 43        Defendant next contends that the court erred in allowing Detective Arteaga to testify to the statements codefendant gave to police. Specifically, defendant asserts that this testimony was inadmissible hearsay and violated his sixth amendment right to confrontation (U.S. Const., amend. VI) under *Bruton v. United States*, 391 U.S. 123 (1968).  Initially, the State responds that defendant forfeited this argument because he did not raise it with the required specificity in his amended motion for a new trial.

¶ 44        Generally, an alleged error must be raised at trial and in a written posttrial motion to be preserved for appellate review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, our supreme court recently held that there are three exceptions to forfeiture: "(1) constitutional issues that were properly raised at trial and may be raised later in a postconviction petition; (2) challenges to the sufficiency of the evidence; and (3) plain errors." *People v. Cregan*, 2014 IL 113600, ¶ 16 (citing *Enoch*, 122 Ill. 2d at 190). The supreme court reasoned that constitutional issues are exempt from forfeiture when they have been raised at trial but omitted from a posttrial motion because if these issues are not addressed on direct appeal, they can be raised in a postconviction petition. *Id.* ¶ 18. Thus, allowing review of these arguments on appeal when they would otherwise be forfeited promotes judicial economy. *Id.* Here, although defendant objected at trial that testimony regarding codefendant's confession violated his sixth amendment right to confrontation, this alleged error was not raised in his amended motion for a new trial. However, because this issue raises constitutional concerns, it could be raised in a postconviction petition. Thus, the constitutional issue exception applies and review of the issue is not forfeited.

¶ 45        Nonetheless, it is apparent from our review of the record that the court did not err in allowing testimony of codefendant's confession.  Evidentiary rulings are within the trial

court's sound discretion and will not be reversed absent an abuse of discretion. *People v. Maldonado*, 402 Ill. App. 3d 411, 416 (2010). Normally, when a codefendant is not available for cross-examination at trial, the codefendant's confession that inculpates the defendant cannot be introduced as substantive evidence. *Bruton v. United States*, 391 U.S. 123, 125 (1968). The police are permitted, however, to testify to their investigatory process, and can refer to statements made by a codefendant so long as the officer does not testify to the content of the statement. *People v. Jones*, 153 Ill. 2d 155, 159-61 (1992); *People v. Sample*, 326 Ill. App. 3d 914, 920-21 (2001). Such evidence is not offered for the truth of the matter asserted against the defendant, but rather, it is offered to show the steps taken that led to defendant's arrest. *Sample*, 326 Ill. App. 3d at 920-21*; People v. Henderson*, 142 Ill. 2d 258, 304 (1990). Otherwise the jury may be left "with the impression that this investigation fell out of thin air." *People v. Trice*, 217 Ill. App. 3d 967, 977 (1991). The testimony is admissible even if a logical inference could be drawn that the substance of the codefendant's statement motivated the officer to arrest the defendant. *People v. Gacho*, 122 Ill. 2d 221, 248-49 (1988).

¶ 46     Here, the State and the court took significant precautions to not introduce substantive evidence from codefendant's confession. Notably, there was no reference to codefendant's confession until defense counsel opened the door on cross-examination of Detective Arteaga. Defense counsel's questioning suggested that the detectives had no more reason to arrest defendant in 2012 than in 2006, when in fact, codefendant's confession provided them with more information regarding defendant's involvement in the murder. The State objected to the implication created by this questioning and, in a sidebar, the court agreed.  It allowed the

State to question Detective Arteaga about the statement the detectives received from codefendant, which led their investigation to the arrest of defendant.

¶ 47    Furthermore, we find the case cited by defendant, *People v. Cruz*, 121 Ill. 2d 321 (1988), readily distinguishable from this case. In *Cruz*, the defendant and the codefendants were tried jointly. *Id.* at 331. The codefendants' statements were introduced at trial with portions redacted. *Id.* Thus, although the statements did not expressly name the defendant, the content of the statements was admitted. *Id.* The court held that "the nature of these redactions in the context of the joint trial and the testimony linking [the defendant] with [the codefendant] rendered it impossible for the jury to conclude that the persons to whom Hernandez referred were anyone other than the two men seated next to him in the courtroom." *Id.* In addition, the prosecutor exacerbated this error by encouraging the jury in closing argument to consider the codefendants' admissions against the other defendants. *Id.* at 332-33. Thus, the court found that the admission of the statements was error. *Id.* at 333. By contrast, here, defendant and codefendant were not tried jointly and none of the substance of codefendant's statement was admitted. Rather, Detective Arteaga merely referenced that codefendant had made a statement and that subsequently the detectives arrested defendant. In fact, the record indicates that the prosecutor and the court took steps to ensure that the substance of codefendant's statement was not introduced. Accordingly, the court did not abuse its discretion in allowing this testimony.

¶ 48                            c. Testimony of Witness's Alleged Coercion

¶ 49    Defendant additionally contends that his sixth amendment right to confrontation was violated when the court did not allow defense counsel to question Scott about whether she was coerced by the State to testify. The State again asserts that this argument is forfeited

because it was not included in the amended motion for a new trial. As noted above, a claim alleging that a defendant's sixth amendment right to confrontation was violated is a constitutional issue and is not forfeited on review. *People v. Cregan*, 2014 IL 113600, ¶ 18. The State further argues that the court properly limited questioning of Scott on the alleged coercion because defendant had no evidence to prove up a good faith basis that Scott had in fact been coerced by the State.

¶ 50 A defendant has a sixth amendment right to confront adverse witnesses through cross-examination. *People v. Collins*, 366 Ill. App. 3d 885, 892 (2006). This right includes questioning a witness regarding potential biases, prejudices, motives, or interests. *Id.* However, the trial court has discretion to reasonably limit cross-examination. *People v. Tabb*, 374 Ill. App. 3d 680, 689 (2007). "[U]nless the defendant can show his or her inquiry is not based on a remote or uncertain theory, a court's ruling limiting the scope of examination will be affirmed." *Id.* (citing *People v. Phillips*, 186 Ill. App. 3d 668, 678 (1989)). When a line of questioning is objected to, the defendant must make an offer of proof to convince the trial court to allow the testimony or establish that the proposed evidence goes to bias or motive to testify falsely. *Id.* Evidence based on speculation or conjecture is not sufficient. *Id.*

¶ 51 Here, defense counsel conceded at trial that if Scott answered that she was coerced, he did not have a witness or other evidence to present that would impeach her. There was no corroborating evidence to suggest that defense counsel's inquiries had any validity. Moreover, we note that defendant was not prejudiced by the court limiting Scott's cross-examination. Despite the fact that the court sustained the State's objections on this matter, defense counsel was able to successfully ask questions regarding whether Scott was threatened and she answered that she was not. Additionally, defense counsel was permitted to

ask Scott about the fact that she was not testifying voluntarily and draw the jury's attention to the fact that she was wearing a Department of Corrections outfit because she had been arrested for contempt. Accordingly, the court did not abuse its discretion in prohibiting defendant from asking Scott about alleged coercion.

¶ 52                              d. Sufficiency of the Evidence

¶ 53      Finally, defendant contends that the evidence presented at trial was not sufficient to prove him guilty beyond a reasonable doubt. Initially, the State points out that defendant's argument is short on analysis and authority and argues that it is insufficient to sustain a claim on appeal. We agree that the support for this argument is lacking, however, as sufficiency of the evidence is an exception to the forfeiture rule, we will reach the issue. See *People v. Cregan*, 2014 IL 113600, ¶ 18. The State further maintains that there was sufficient evidence, especially when viewed in the light most favorable to the People, to establish defendant's guilt. The State urges that it is the jury's role, not the court's, to determine the credibility of witnesses and the weight of evidence.

¶ 54      In reviewing a challenge to the sufficiency of the evidence, it is not the function of the appellate court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Rather, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *People v. Jordan,* 218 Ill. 2d 255, 269-70 (2006) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is the responsibility of the trier of fact to determine the credibility of witnesses and the weight to give their testimony, resolve any conflicts and inconsistencies in the evidence, and draw reasonable

inferences from the record. *Sutherland,* 223 Ill. 2d at 217. We will not substitute our judgment for that of the trier of fact. *Id.*

¶ 55    Defendant contends that the evidence to convict him was insufficient because only two eyewitnesses actually testified that they saw him shoot Bowman. However, a single credible eyewitness is sufficient for a conviction. *People v. Herron*, 2012 IL App (1st) 090663, ¶ 23. Here, the jury must have found at least one of the State's witnesses credible because it found defendant guilty, and we will not reweigh the jury's credibility determination. Further, Whiteside and Richardson's testimony was corroborated by Scott, Butler, and Collier. Scott testified that she saw defendant with a gun and Butler and Collier testified generally to the events that occurred that night, which established that there were two shooters and placed defendant at the scene with a gun. Defendant points to inconsistencies in the witnesses' testimony to assert that he could not be proven guilty beyond a reasonable doubt. However, this court has held that "[m]inor inconsistencies in testimony do not, by themselves, create a reasonable doubt." (Internal quotation marks omitted.) *People v. Wesley*, 382 Ill. App. 3d 588, 592 (2008).

¶ 56    Defendant makes the additional argument that the evidence against him was insufficient because the State did not present any physical evidence linking him to the crime. However, because a single credible witness is sufficient for conviction, it follows that that the State was not required to present corroborating physical evidence under these circumstances. *People v. Herron*, 2012 IL App (1st) 090663, ¶ 23. Accordingly, we cannot say that no rational trier of fact could have found defendant guilty beyond a reasonable doubt.

¶ 57                                III. CONCLUSION

¶ 58    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 59        Affirmed.