2021 IL App (2d) 190416-U
No. 2-19-0416
Order filed June 14, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-239 |
| XZEMENIZE O. BOOSE, | ) ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's convictions of home invasion were affirmed where (1) defendant's primary claim of ineffective assistance of counsel was not conducive to review on direct appeal, (2) defendant's other allegations of ineffective assistance lacked merit, (3) there was sufficient evidence for a rational jury to find that defendant was one of the perpetrators of the home invasion and that he possessed a firearm during the commission of the offense, (4) the trial court did not err by failing to sanction the State in connection with a police officer's deleted body camera footage, and (5) the admission of a small excerpt from a 911 call did not violate the Confrontation Clause.

¶ 2   Following a jury trial in the circuit court of Lake County, defendant, Xzemenize O. Boose,

was found guilty of aggravated robbery (720 ILCS 5/18-1(b)(1) (West 2018)), armed robbery (720

ILCS 5/18-2(a)(2) (West 2018)), and three counts of home invasion (720 ILCS 5/19-6(a)(3) (West 2018)). The court sentenced defendant to 21 years' imprisonment on each of the home invasion counts, with the sentences to run concurrently. The court determined that the aggravated robbery and armed robbery counts merged with the home invasion counts. Defendant appeals, and we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     We will provide an overview of the case and then supplement the facts as needed in the analysis section to address the various claims that defendant raises on appeal.

¶ 5     On the night of January 23, 2018, Eva Taylor was at her home in Gurnee with her three adult children: Jermy Brady, Amanda Brady, and Brittany Brady.[1] Around 11 p.m., Eva, Jermy, and Amanda were in their respective bedrooms on the second floor of the house. Brittany was in the basement. The doorbell rang unexpectedly. Eva and Jermy looked outside, but they did not see anybody. The front door suddenly burst open. Two individuals wearing hoodies entered the house and ran upstairs, while a third individual remained at the front door. One of the individuals who ran upstairs was holding a gun. The two intruders immediately went to Jermy's room and demanded money and marijuana from him. Jermy had money in his room but no marijuana. Eva hit the armed intruder with a vacuum cleaner, and Amanda tried unsuccessfully to knock the gun out of that intruder's hand. Jermy scuffled with the unarmed intruder. At different points during the home invasion, the armed individual pointed the gun at Eva, Jermy, and Amanda. Meanwhile, Brittany called 911 from the basement. The intruders soon ran down the stairs, exited the house

---

[1] Her name also appears in the record as "Brittine." She did not testify at trial to spell her name for the record. For purposes of this disposition, we will use "Brittany."

along with the third perpetrator, and fled the scene. None of the witnesses observed whether the perpetrators left by car or on foot. The first police officers arrived at the scene shortly thereafter.

¶ 6    From the face and the voice, Jermy initially recognized the armed intruder as somebody whom he knew as "X." Shortly after the home invasion, Jermy looked on social media, discovered X's full name, and identified defendant as the armed intruder. According to Jermy, he and defendant attended the early portion of high school together. After high school, they interacted on social media and occasionally ran into each other through a mutual friend. Jermy claimed that he most recently saw defendant in September 2017, about four months before the home invasion. Jermy explained that defendant had seen Jermy's house prior to January 2018 but had never been inside of it.

¶ 7    According to Jermy, on the day before the home invasion, he posted something on social media about having won money gambling. Jermy claimed that, prior to the home invasion, defendant commented on that post. After defendant commented on Jermy's post, an unknown person also contacted Jermy asking about marijuana, which Jermy found strange. Jermy testified that, in the aftermath of the home invasion, defendant "blocked" him on social media. At trial, there was no evidence corroborating Jermy's testimony about these various social media interactions, as Snapchat automatically deleted the various messages that Jermy described. Nevertheless, after the home invasion, Jermy was able to view some of defendant's social media profiles with the help of someone who was still "friends" with defendant on social media.

¶ 8    On January 24, 2018, Jermy viewed a photographic array that included a photograph of defendant. From that array, Jermy identified defendant as the armed intruder. On January 29, 2018, Eva and Amanda separately viewed photographic arrays that both included a photograph of defendant. Eva identified defendant as the armed intruder. Amanda did not make an identification,

but she indicated in the comments section of the computer program that the armed intruder "had big lips and a big nose." Eva did not know defendant prior to the home invasion. She denied having ever seen a picture of defendant before she identified him in the photographic array.

¶ 9    The other two perpetrators of the home invasion were never identified. Defendant did not make any incriminating statements to the police, nor was he linked to the crime by physical evidence. Thus, the State's case against defendant rested solely on Jermy's and Eva's identifications of defendant as the armed intruder.

¶ 10    Defendant retained two attorneys, who jointly handled the defense. Those attorneys filed multiple pretrial motions on defendant's behalf that required lengthy evidentiary hearings. Specifically, defendant moved to (1) suppress Jermy's and Eva's photographic identifications of defendant, (2) bar Jermy from testifying that he recognized defendant's voice during the home invasion, (3) bar social media evidence, (4) dismiss the bill of indictment due to a discrepancy between the testimony that one police officer provided during the grand jury proceedings and that officer's testimony during the hearings on defendant's pretrial motions, and (5) dismiss the case, or to otherwise sanction the State, because one of the responding officer's body camera footage was not preserved. The court denied motions 1, 2, and 4. The defense ultimately withdrew motion number 3, informing the court that, for strategic reasons, the defense would not object to the social media evidence. With respect to motion number 5, the court declined to dismiss the case based on the missing body camera footage but reserved the issue of whether to instruct the jury with an adverse-inference instruction. The defense did not subsequently request or tender an adverse-inference instruction during the instructions conference.

¶ 11    The defense's theory was that Jermy and Eva were mistaken in believing that defendant was one of the perpetrators of the home invasion. In both opening statements and closing

arguments, defendant's attorneys repeatedly mentioned "confabulation." Defense counsel described confabulation as "when a person takes events or facts from one scenario and superimposes them on another event." According to defense counsel: "In other words, you have a scenario; but you put it together with your actual memory. And usually it's done with no intent to deceive." Counsel added that it was "human nature" to try to fill in the gaps of our memory.

¶ 12    Aside from defense counsels' use of the perhaps unfamiliar term "confabulation" during opening statements and closing arguments, the defense attempted to discredit the two eyewitness identifications by familiar and non-scientific means. For example, defense counsel attempted to demonstrate that the lighting was not ideal during the home invasion and that Eva was not wearing her reading glasses when she saw the perpetrators. The defense also introduced testimony that defendant had noticeable facial hair in January 2018, whereas none of the witnesses to the home invasion described the perpetrators as having facial hair. The defense highlighted that neither Eva, Jermy, nor Amanda could be sure that the object that they saw in one of the intruder's hands was a real firearm.

¶ 13    Defendant presented an alibi defense. He testified that he was sick on the night of the home invasion and that he stayed at his mother's house in North Chicago. Defendant's mother and two of his sisters provided corroborating testimony. According to defendant's cell phone records, he received a phone call at 10:10 p.m., which was approximately 50 minutes before the home invasion. Cell phone plotting evidence showed that defendant could have been at his mother's house when he received that phone call. However, defendant's mother's house was only a 10 to 15-minute drive from the victims' house. The next available tracking data from defendant's cell phone was not until many hours after the home invasion.

¶ 14    Whereas Jermy testified that he knew defendant and interacted with him both on social

media and in person, defendant claimed that he did "not know Jermy Brady from a can of paint." Defendant testified that he was aware that he attended freshman year of high school with Jermy. However, defendant insisted that he and Jermy never interacted. Defendant denied having ever been to Jermy's house and denied participating in the home invasion.

¶ 15    The jury found defendant guilty on the five counts that proceeded to verdicts (the State dismissed two counts during trial). The court denied defendant's posttrial motion.

¶ 16    Defendant filed a *pro se* pleading alleging that his trial attorneys were ineffective in many ways. The court conducted a *Krankel* inquiry regarding those allegations and determined that there was no need to appoint new counsel for defendant. During that inquiry, defense counsel stated for the record that, shortly before trial, the prosecutor offered defendant probation in exchange for a guilty plea to aggravated robbery. Defense counsel urged defendant to accept that offer. Against the advice of counsel, defendant rejected the offer and proceeded to trial. After addressing each of defendant's claims of ineffective assistance, the court determined that there was no need to appoint new counsel for defendant.

¶ 17    Due to a 15-year firearm enhancement, the minimum sentence that defendant faced was 21 years in prison on each of the home invasion counts, to be served concurrently. The court imposed the minimum sentence. Defendant timely appealed.[2]

---

[2] Defendant's brief includes an appendix in between the "points and authorities" section of the brief and the "nature of the case" section, with the table of contents for the appendix immediately following the cover page. Supreme Court Rule 341(h) (eff. Oct. 1, 2020) specifies that the appendix and its table of contents must be at the very end of the brief. We urge counsel to ensure that any future briefs that she files conform to the requirements of Rule 341.

¶ 18                            II. ANALYSIS

¶ 19    Defendant argues that (1) he received ineffective assistance of counsel, (2) the State failed

to prove that he possessed a firearm during the offense, (3) the trial court should have sanctioned

the State in connection with the lost body camera footage, (4) the court erroneously allowed the

State to play a portion of a 911 call for the jury, and (5) the State failed to prove that defendant

was one of the perpetrators of the home invasion.

¶ 20                     A. Ineffective Assistance of Counsel

¶ 21    Defendant first argues that he received ineffective assistance of counsel. His primary

contention is that his attorneys were ineffective because they admitted that a crime occurred but

failed to provide an expert to testify about the unreliability of eyewitness testimony. According to

defendant, defense counsel inappropriately attempted to "argue the science" without an evidentiary

basis for doing so. Defendant identifies various other purported deficiencies in the way that his

attorneys handled the case.

¶ 22    The governing principles are outlined in *Strickland v. Washington*, 466 U.S. 668 (1984).

In reviewing a claim of ineffective assistance, we apply a "strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance," and the defendant must

overcome the presumption that his counsel pursued a sound trial strategy. *Strickland*, 466 U.S. at

689. To sustain a claim of ineffective assistance, a defendant must show that his counsel's

performance was deficient and that such deficiency prejudiced the defense. *Strickland*, 466 U.S.

at 687. An attorney's performance is deficient where he or she made errors that were so serious

that he or she "was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment." *Strickland*, 466 U.S. at 687. A defendant establishes prejudice where "counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

*Strickland*, 466 U.S. 687. In that respect, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 23   We will first address defendant's argument that his attorneys were ineffective for conceding that a crime occurred and then failing to call an expert to testify about eyewitness identifications. We will separately address the other deficiencies that defendant identifies in his attorneys' performance.

¶ 24                         1. *Eyewitness-Identification Expert*

¶ 25   The State raises a preliminary issue as to whether defendant's argument is reviewable on direct appeal. The State notes that "[w]holly absent from defendant's argument is a showing that there is an expert available and exactly what said expert would testify about in the context of the facts and circumstances in this case." According to the State, "the record is not developed as to whether or not an expert witness was available to the defense, why the defense did or did not choose to retain an expert if one was available and what the People might have offered in response to any proposed expert." The State argues that defendant's claim is better suited to postconviction proceedings, where a factual record might be developed.

¶ 26   In *People v. Veach*, 2017 IL 120649, ¶ 48, our supreme court held that a reviewing court "should carefully consider each ineffective assistance of counsel claim on a case-by-case basis" to determine whether the claim is conducive to review on direct appeal. The court explained that "ineffective assistance of counsel claims may sometimes be better suited to collateral proceedings but only when the record is incomplete or inadequate for resolving the claim." *Veach*, 2017 IL 120649, ¶ 46. In accordance with *Veach*, we have carefully considered whether the record is

sufficient to evaluate defendant's claim of ineffective assistance based on the failure to retain an eyewitness-identification expert. For the following reasons, we hold that this claim is not conducive to review on the present record.

¶ 27     We note at the outset that defendant resorts to unwarranted hyperbole when he discusses his counsels' purported deficiencies. For example, defendant argues that his attorneys "set [him] up to fail," "presented no evidence to support their misidentification theory," and displayed "uncommon ineptitude." The record, however, shows that defense counsel aggressively litigated numerous pretrial motions in their attempts to exclude evidence and to obtain dismissal of the charges. Furthermore, even though defendant faced numerous charges, including non-probationable class X offenses, defendant's attorneys were able to procure an offer from the prosecutor that would have resulted in defendant receiving probation instead of a prison sentence. When defendant declined that offer and proceeded to trial, the defense attorneys thoroughly cross-examined the State's witnesses and presented an alibi defense. Moreover, the attorney who handled defendant's closing argument highlighted numerous purported flaws in the State's evidence and urged the jury to find defendant not guilty. Thus, to say that defense counsel set defendant up for failure, failed to present evidence to support their misidentification theory, or displayed uncommon ineptitude simply is not true.

¶ 28     Additionally, although defendant criticizes his attorneys for conceding that a home invasion occurred, that obviously was a reasonable trial strategy. There would have been no basis in the evidence for the defense to argue that Eva, Jermy, and Amanda lied about being crime victims. Defense counsel would have risked losing all credibility with the jury if counsel argued that no crime occurred.

¶ 29    Notwithstanding these initial observations, we note that defendant is correct that his counsel made certain comments to the jury that lacked a basis in the evidence. Defendant's attorneys used some variation of the word "confabulate" seven times during opening statements and three times during closing arguments. Without an expert to discuss the concept of confabulation and how that might relate to Jermy's and Eva's identifications of defendant, defense counsel themselves discussed, defined, and applied a concept that had no basis in the evidence.

¶ 30    However, although defense counsel argued that the witness identifications here were confabulated, there is no way for us to evaluate defendant's contention that his attorneys were ineffective for failing to present an expert to testify regarding the science of eyewitness identifications. The record does not contain an offer of proof regarding this science, let alone a basis for applying it to the facts at bar. We have no information about the identity of any expert who might have been available to the defense. We likewise have no meaningful information about the details of any potential expert's testimony. Defendant vaguely asserts that "[t]he expert would have provided proof that eyewitnesses can be unreliable, often misidentify people when under extreme stress and would explain why this case was ripe for unreliability." In his reply brief, defendant insinuates that an expert might have testified that Eva's and Jermy's identifications were confabulated. But we have no idea who this hypothetical expert is, what his or her qualifications are, or why he or she would opine that Eva's and Jermy's identifications were problematic.

¶ 31    Defendant relies heavily on *People v. Lerma*, 2016 IL 118496, a case in which our supreme court approved of the use of experts to explain the evolving science of eyewitness identifications. In *Lerma*, the record contained reports from two different proposed defense experts outlining the experts' opinions. *Lerma*, 2016 IL 118496, ¶¶ 8, 14. Under those circumstances, the supreme court was able to assess on direct appeal whether the trial court abused its discretion by barring the

defense from presenting its proposed testimony. Here, by contrast, we lack even basic information about the nature of the expert testimony that could have been offered.

¶ 32    On the present record, we have no way to evaluate whether defendant's attorneys were constitutionally deficient for failing to present expert testimony or whether such deficiency prejudiced defendant. Accordingly, we hold that defendant's claim of ineffective assistance in connection with the failure to present an expert is better suited for collateral proceedings, where defendant will have an opportunity to develop a factual record for his claim. See *People v. McGhee*, 2012 IL App (1st) 093404, ¶ 52 (addressing the defendant's postconviction claim that his trial counsel was ineffective for failing to present expert testimony regarding the reliability of eyewitness identifications).

¶ 33                    2. *Other Allegations of Ineffective Assistance*

¶ 34    Defendant's remaining allegations of ineffective assistance are conducive to review but lack merit.

¶ 35    Defendant asserts that his counsel failed "to establish on cross-examination that Jermy really did not have a significant opportunity to observe the defendant." Defense counsel were not deficient in this regard, as the defense highlighted this issue in closing argument:

> "This offense occurred rapidly. It occurred—it was in low light conditions or almost
> no light conditions. Jermy himself says he was balled up. His hands in front of his head.
> He was in a fetal position. *** The only one that [*sic*] really had the opportunity to view
> the offender at the time of the offense is the sister ***."

¶ 36    Defendant also asserts that his counsel should have pointed out that Jermy could not describe the unarmed intruder. We discern no deficiency in  counsels' performance in this regard, nor any prejudice to the defense. Defendant does not cite the record to support his assertion that

Jermy could not describe the unarmed intruder. Even assuming that Jermy would not have been able to describe the unarmed intruder had he been asked, that does not necessarily cast doubt on Jermy's identification of defendant as the armed intruder. Jermy testified that he knew defendant prior to the home invasion, and Jermy recognized defendant's voice and face during the home invasion.

¶ 37    Defendant also contends that his counsel should have challenged the foundation for Jermy's testimony that, prior to the home invasion, he posted on social media that he won money gambling. Defendant has failed to demonstrate ineffective assistance of counsel. Prior to trial, the defense moved to bar all social media evidence for lack of foundation. The defense later withdrew that motion, informing the court that it was doing so for strategic reasons. The defense had an obvious reason for wanting Jermy's testimony in evidence: it allowed defense counsel to argue to the jury that many people were aware of Jermy's gambling winnings and might have wanted to rob him (Jermy "probably did some really stupid things on the internet and said a lot of stupid things to 130 people, any one of them which could be subjects in this case and suspects in this case").

¶ 38    Defendant complains that defense counsel "failed to educate themselves regarding Snapchat, to learn its 'language' and how it works." Although it was apparent from some of the questions at trial that defendant's attorneys were not adept at social media, nothing in their performance in this regard was constitutionally deficient or affected the result of trial.

¶ 39    Furthermore, defendant criticizes his counsels' defense against the State's allegation that defendant possessed a firearm. Specifically, defendant asserts that "BB guns and pellet guns can look like a real firearm," and he proposes that his attorneys should have used demonstrative evidence to illustrate this point. We discern no deficiency in counsels' performance in this respect.

Defense counsel (1) cross-examined Eva, Jermy, and Amanda about their ability to determine whether a real firearm was involved in the offense, (2) argued in closing that the State failed to prove the presence of a firearm, and (3) successfully advocated for the jury to be given an instruction informing them of the definition of a firearm.

¶ 40    Defendant also suggests that his counsel forgot to ask him during his testimony whether he had facial hair on January 23, 2018. Defendant suffered no prejudice. Such evidence would have been cumulative, as defendant's sister testified that defendant had "[v]ery noticeable" facial hair on January 23, 2018. Defendant also hypothesizes that there could have been some photograph available to the defense that would have proved that defendant had facial hair on the date of the home invasion. There is no indication in the record that such photograph existed, so defendant's argument is pure speculation. Additionally, at the *Krankel* hearing, defense counsel explained that they considered demanding a "data drop" of defendant's cell phone, which was in the State's possession, to see if any exculpatory evidence could be obtained from the phone. However, defendant refused to make such demand upon the State, due to concerns about "incriminating evidence" on his phone.

¶ 41    Defendant further criticizes his counsel for failing to emphasize that Jermy "consistently answer[ed] questions with qualifiers, such as, 'I think,' 'I believe,' 'probably' and 'I do not recall' followed by a leading question so the State can get the answer it wants." The record contradicts this claim, as defense counsel indeed criticized Jermy's demeanor. For example, during closing argument, defense counsel said: "You saw the way this young guy testified. There is something going on. I don't know what it is. It's some unknown issue." Later during closing argument, defense counsel added: "Think about these questions as he's talking and ask why should we believe Jermy Brady based on the manner of testimony that we all saw in this courtroom?"

¶ 42 Defendant also maintains that his counsel should have objected when Jermy testified about getting a deadbolt lock and an alarm system after the home invasion. Given that the defense reasonably conceded that a home invasion occurred, there was no reason to object to Jermy's testimony on this point. Contrary to what defendant argues, we do not see how Jermy's testimony improperly "prey[ed] on the emotions of the jury." Most people would probably expect that a family would elevate its home security measures after a home invasion.

¶ 43 Defendant next argues that his defense counsel should have objected when Jermy testified that he received a message on social media from an unknown individual who was seeking marijuana. However, it seems that the defense strategically allowed this evidence to come in so that the jury might infer that Jermy was a drug user or even a dealer. Defense counsel hit on that theme multiple times in closing argument ("Jermy Brady is obviously or we can infer that he is lying about his marijuana use."; "Why did Jermy have lighters on his dresser when he is telling you he stopped marijuana use?").

¶ 44 Finally, defendant criticizes his counsel for failing to note a discrepancy in Jermy's testimony as to whether he "blocked" defendant on social media before the home invasion or whether defendant blocked him after the home invasion. Defendant explains that, if Jermy blocked defendant before the home invasion, then defendant would not have seen Jermy's post about his gambling winnings, and defendant would have had no motive to rob Jermy. This argument does not support a claim of ineffective assistance of counsel. Defendant correctly identifies an apparent discrepancy in Jermy's testimony, insofar as Jermy asserted "I actually blocked him" but then immediately explained that defendant blocked him after the home invasion. Neither the prosecutor nor defense counsel followed up to clarify when, if ever, Jermy blocked defendant on social media. Considering that the attorneys did not follow up on the issue and that defendant acknowledges that

the discrepancy was "subtle," we cannot say that the jury might have evaluated Jermy's credibility differently had defense counsel pointed out this discrepancy during closing argument.

¶ 45    For these reasons, we hold that the claims of ineffective assistance which are conducive to review lack merit.

¶ 46                  B. Sufficiency of the Evidence: Presence of a Firearm

¶ 47    Defendant next argues that the State failed to prove that he possessed a firearm. Based on that premise, he contends that (1) his sentence, which included a 15-year firearm enhancement, was excessive and (2) he was not proved guilty of home invasion. The State responds that the evidence was sufficient to prove that defendant possessed a firearm.

¶ 48    When reviewing a challenge to the sufficiency of the evidence, the question on appeal is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In conducting our review, we "will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *McLaurin*, 2020 IL 124563, ¶ 22.

¶ 49    The State charged defendant with home invasion under section 19-6(a)(3) of the Criminal Code of 2012 (Code) (720 ILCS 5/19-6(a)(3) (West 2018)). One of the elements of that offense is that the defendant was "armed with a firearm." 720 ILCS 5/19-6(a)(3) (West 2018). A violation of this subsection of the home-invasion statute is a "Class X felony for which 15 years shall be added to the term of imprisonment imposed by the court." 720 ILCS 5/19-6(c) (West 2018).

¶ 50    For purposes of the Code, " 'firearm' has the meaning ascribed to it in Section 1.1 of the Firearm Owners Identification Card Act" (FOID Card Act). 720 ILCS 5/2-7.5 (West 2018). Section 1.1 of the FOID Card Act generally defines "firearm" as "any device, by whatever name

known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas." 430 ILCS 65/1.1 (West 2018). The FOID Card Act specifically excludes from the definition of "firearm" numerous objects, including certain BB guns. 430 ILCS 65/1.1 (West 2018). Given this definition, one might expect that the State could never prove that a defendant possessed a "firearm" unless the weapon was discharged during the offense or the police later recovered the weapon and determined that it met the statutory definition. However, that is not how the case law has developed.

¶ 51　　For example, in *People v. Washington*, 2012 IL 107993, our supreme court held that a reasonable jury could have determined that the defendant possessed a firearm, even though the object that the State's witness identified as a gun was not fired and was never recovered. The court reasoned:

> "Here, the victim, Abdallah Farraj, was abducted in broad daylight. Farraj testified that defendant pointed a gun at him, forced him into the truck, and then held a gun to his head while he sat between defendant and his accomplice in the front of the truck. Farraj also testified that defendant pointed the gun at him when he was later forced into the cargo area of the truck. This evidence established that, for several minutes, Farraj had an unobstructed view of the weapon defendant had in his possession during the commission of the crimes. He testified that it was a gun.
>
> We note, too, that there was no real dispute at trial that defendant possessed some type of gun when he committed the crimes—during closing argument defense counsel did not argue that defendant did not possess a gun, only that it could not be known for sure whether the gun was real or a toy because no gun was ever recovered. However, given Farraj's unequivocal testimony and the circumstances under which he was able to view the

gun, the jury could have reasonably inferred that defendant possessed a real gun." *Washington*, 2012 IL 107993, ¶¶ 35-36.

¶ 52    In *People v. Wright*, 2017 IL 119561, our supreme court similarly affirmed a conviction in a case where the only evidence of a firearm came from three witnesses' descriptions of an object that they saw during the offense. The court explained:

"[Witness] Perez testified at trial that codefendant told him 'this is a robbery' and lifted his hoodie to reveal what 'looked like a black automatic, black gun.' He thought it was a semiautomatic and related that he had experience firing such guns. He further testified that while walking toward his office he 'felt something sharp in [his] back,' which felt like the barrel of a gun. On direct questioning by defendant, Perez testified that he was '100% sure' that the weapon codefendant displayed was an 'actual firearm.' [Witness] Tsegaye also testified that codefendant told her she was being robbed and that she saw the handle of a gun in the waistband of his pants. Additionally, [witness] Morina testified that he had seen guns before and believed codefendant's gun was a '9 millimeter pistol.'

Viewing this evidence in the light most favorable to the State, it was not so unreasonable, improbable, or unsatisfactory that no rational trier of fact could have found that codefendant was armed with a firearm during the commission of the robbery." *Wright*, 2017 IL 119561, ¶¶ 76-77.

¶ 53    Here, three witness—Eva, Amanda, and Jermy—testified that one of the intruders had a "gun." Eva testified that the armed intruder pointed that gun "in [her] face" when he told her to "get back in [her] room, bitch." According to Eva, the object that she saw "looked like a gun," was black, and did not have an orange tip on it. There was nothing "on the gun that would have made [Eva] believe that it was a fake gun."

¶ 54    Amanda similarly testified that one of the intruders pointed a gun "into [her] face" and told her to "get back." She said that she got "a good look" at the gun as she tried, unsuccessfully, to "tap" it down from the intruder. Like Eva, Amanda testified that the object "looked like a gun," was black, and did not have an orange tip on it. There was nothing "on the gun that made [Amanda] believe that it was a look-alike or a fake gun." Asked why she tried to hit the object away from the offender if she thought that it was a real gun, Amanda explained that she was trying to protect Eva and Jermy.

¶ 55    Jermy likewise testified that one of the intruders pointed a gun at him and told him something to the effect of "get down." According to Jermy, the armed intruder at one point touched Jermy's head "slightly" with the gun. Although Jermy was unable to recall "the full feeling" or texture of the gun, he described it as black and without an orange tip. Jermy explained that he had previously seen and held a firearm. He said that the gun used during the home invasion "100 percent seemed like a real gun" to him. However, Jermy acknowledged that, during the home invasion, he was not "trying to decipher if it was a firearm or not," though he "believed it was."

¶ 56    On cross-examination, Eva testified that she did not own any firearms, nor had she previously seen one up close. Eva also admitted that she would not "be able to tell the difference between an actual or a look-alike firearm." Amanda, too, testified on cross-examination that she had never owned, handled, or touched a firearm. Amanda responded in the affirmative when defense counsel asked her whether she was "familiar with the difference between a toy firearm and a real firearm." However, when defense counsel said to Amanda that she "can't tell for sure whether this was a firearm *** as opposed to a toy that looked like a firearm," she responded: "I guess not."

¶ 57   In accordance with *Washington* and *Wright*, the testimony here was sufficient for a reasonable factfinder to conclude that defendant possessed a firearm during the home invasion. Three witnesses saw the gun up close, and one of the witnesses even had an opportunity to feel it against his head. Although Eva and Amanda had not previously handled a firearm, Jermy had. Each of the witnesses described the object as a gun, and they said that it looked real. This is sufficient under the case law to uphold the jury's verdict.

¶ 58   Defendant nevertheless contends that we must look only to the witnesses' objective descriptions of the weapon, not the witnesses' subjective beliefs. To that end, citing *People v. Ross*, 229 Ill. 2d 255 (2008), defendant asserts that "[t]he fact-finder must ignore any subjective beliefs about the nature of the weapon in its analysis of the sufficiency of" eyewitness testimony. Later in his brief, again citing *Ross*, defendant argues that "[a]ny subjective belief testimony from the witness must be excluded in the evaluation of the evidence." Defendant maintains that the only objective descriptions of the object used during the offense were that it was black, shaped like a gun, and did not have an orange tip. From these premises, defendant argues that the witnesses' descriptions were not sufficiently specific to support a conclusion that he possessed a firearm.

¶ 59   *Ross* does not support such a broad proposition. In *Ross*, although the victim of a robbery testified that the perpetrator had a small, "black, very portable gun," the police recovered this object shortly after the robbery and determined that it was a pellet gun or a BB gun. *Ross*, 229 Ill. 2d at 258. At trial, the State failed to introduce this item or a picture of it into evidence, and there was no testimony that it was loaded. *Ross*, 229 Ill. 2d at 277. Under those circumstances, our supreme court held that the State failed to establish that the item that was recovered was a "dangerous weapon" for purposes of elevating the offense of robbery to armed robbery. *Ross*, 229 Ill. 2d at 276-77. To that end, the court reasoned that "[t]he trial court incorrectly based its ruling

on the subjective feelings of the victim, rather than the objective nature of the gun." *Ross*, 229 Ill. 2d at 277.

¶ 60     Contrary to what defendant suggests, *Ross* does not say that we must always ignore crime victims' testimony about their beliefs as to the nature of the weapon that they saw. When read in proper context, *Ross* merely said that the factfinder in that case should not have relied on the victim's testimony that he saw a "gun" where other evidence conclusively established that the object was a pellet gun or a BB gun that may not even have been loaded.[3] We note that, in *Wright*, which was decided after *Ross*, the supreme court relied, in part, on one of the victim's subjective testimony that he "believed" that the item he saw was a 9-millimeter pistol. *Wright*, 2017 IL 119561, ¶ 76. This is a further indication that "subjective" testimony about the nature of the weapon need not categorically be disregarded.

¶ 61     Defendant further maintains that the witnesses' behavior during the home invasion here did not "correlate" with "a true belief" that a gun would be used against them. It seems that defendant is arguing that, had Eva and Amanda believed that the intruder had a real firearm, they would have been "paralyzed with fear" and would not have engaged in a physical confrontation with that person. This argument does not withstand scrutiny. It is entirely plausible that the witnesses believed that they saw a real firearm.

_____

[3] Like defendant, the First District has read too much into *Ross* by asserting that eyewitnesses' subjective beliefs are categorically irrelevant. See *People v. Clifton*, 2019 IL App (1st) 151967, ¶ 33 ("When analyzing a witness's testimony, we ignore a witness's subjective beliefs about the nature of the weapon.").

¶ 62    Finally, we note that defendant cites *People v. McLaurin*, 2018 IL App (1st) 170258. Our supreme court reversed that appellate decision. See *McLaurin*, 2020 IL 124563.

¶ 63    Accordingly, a reasonable jury could have determined that defendant possessed a firearm during the commission of the offense.

¶ 64                    C. Detective Carol McClanathan's Body Camera Footage

¶ 65    The following additional facts are relevant to defendant's next argument.

¶ 66    Prior to trial, defendant moved to dismiss the case, or to otherwise sanction the State, because the body camera footage of one of the responding officers, Detective Carol McClanathan, was not preserved. The evidence introduced during the hearings on defendant's pretrial motions showed that, shortly after the home invasion, Eva and her children spoke with the first responding officers at the house. McClanathan arrived later. Then, over the course of 30 to 40 minutes, McClanathan spoke with Jermy and had him prepare a written statement. Although McClanathan downloaded her body camera footage to the police department's system, that footage was automatically erased 90 days later—after the court had entered a general discovery order requiring the State to produce its witnesses' recorded statements. Another officer's body camera footage, which was preserved, depicted a small portion of McClanathan's interactions with Jermy on the night of the home invasion.

¶ 67    The defense argued that the loss of McClanathan's body camera footage warranted sanctions, even in the absence of bad faith on the part of the State. According to defense counsel, the lost evidence was important to the defense because McClanathan had no recollection of some of the details of her conversation with Jermy. Defense counsel argued that the lost evidence would have been relevant to evaluating the strength of Jermy's identification of defendant as one of the perpetrators of the home invasion.

¶ 68      The trial court denied defendant's motion to dismiss the case but reserved the issue of whether to give the jury an adverse-inference instruction. In explaining its ruling, the court said that it was "clearly not best practices" for the police to fail to preserve McClanathan's body camera footage. On the other hand, there was no specific preservation order in place and no indication of bad faith on the State's part. The court recognized that dismissing the charges would be an extreme sanction, so the court found it necessary to consider the nature of the prejudice to the defense. The court deemed it significant that officers other than McClanathan took the initial statements from the witnesses, and footage of those conversations were available to the defense. The court also mentioned that the testimony adduced at the pretrial hearings showed that McClanathan did not question Jermy at length, but instead had him prepare a written statement, which likewise was available to the defense. Moreover, the court mentioned that a portion of McClanathan's questioning of Jermy was preserved from a different officer's body camera footage. Ultimately, the court ruled that dismissing the case was "very clearly not an appropriate sanction," given that (1) the defense had the opportunity to question both McClanathan and Jermy at length during the pretrial evidentiary proceedings, and (2) the defense had the benefit of Jermy's written statement and the body camera footage from officers other than McClanathan. The court, however, reserved the issue of whether to give the jury an adverse-inference instruction, as the court wanted to see what evidence came out at trial and whether the lost evidence was "a legitimate trial issue." McClanathan did not testify at trial, so the defense never tendered an adverse-inference instruction regarding her lost body camera footage.

¶ 69      On appeal, defendant argues that the court erred when it failed to sanction the State. The State responds that defendant fails to identify "what sanction he is arguing about for appeal purposes or what remedy he requests" at this juncture. The State further maintains that defendant's

argument lacks merit, in light of the trial court's explanation of its ruling and the fact that defendant never requested an adverse-inference instruction during trial.

¶ 70    "[A] discovery violation can be analyzed under either the due process clauses of the United States (U.S. Const., amends. V, XIV) and State Constitutions (Ill. Const. 1970, art. 1, § 2) or under Illinois Supreme Court Rule 415(g)(i) (eff. Oct. 1, 1971)." *People v. Moore*, 2016 IL App (1st) 133814, ¶ 23. We review *de novo* the denial of a motion to dismiss based on an alleged due process violation for failure to preserve evidence. *Moore*, 2016 IL App (1st) 133814, ¶ 23. However, we review for an abuse of discretion the trial court's decision not to impose sanctions pursuant to our supreme court rules. *Moore*, 2016 IL App (1st) 133814, ¶ 35. Defendant seems to rely primarily on a due process argument, though he also cites Supreme Court Rule 415 for the proposition that sanctions are "entirely in the discretion of the trial court." Whether we analyze the issue as an alleged due process violation or as a request for sanctions under our supreme court rules, the trial court's ruling was proper.

¶ 71    Defendant's due process argument fails. As defendant acknowledges in his brief, we do not know whether McClanathan's body camera footage would have been beneficial to the defense. Thus, the rule outlined in *Brady v. State of Maryland*, 373 U.S. 83 (1963), does not apply. See *Brady*, 373 U.S. at 87 ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"). Instead, we know only that McClanathan's body camera footage might *potentially* have been useful evidence to the defense. The Supreme Court of the United States has held that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Here, the trial court

found that the State did not act in bad faith in failing to preserve McClanathan's body camera footage. Defendant does not challenge that finding on appeal.

¶ 72    Instead, defendant relies on *People v. Newberry*, 166 Ill. 2d 310 (1995). In that case, our supreme court held that, even in the absence of bad faith, the destruction of certain evidence amounted to a due process violation because the evidence was "essential to and determinative of the outcome of the case." *Newberry*, 166 Ill. 2d at 315. As an initial matter, the Supreme Court of the United States has expressed its disapproval of *Newberry*'s constitutional analysis, and the Illinois Appellate Court has questioned *Newberry*'s continued validity. See *Illinois v. Fisher*, 540 U.S. 544, 548 (2004); *Moore*, 2016 IL App (1st) 133814, ¶¶ 27-31. Even if *Newberry* remains good law, McClanathan's body camera footage was not essential to and determinative of the outcome of the case. The defense wanted that footage to determine exactly what Jermy told police officers on the night of the offense. As the trial court recognized, the defense had the benefit of other evidence, including Jermy's written statement and other recorded oral statements that Jermy provided that night. Moreover, Jermy was not the only eyewitness who identified defendant as one of the perpetrators of the home invasion. These circumstances stand in stark contrast to *Newberry*, where the lost evidence left the defendant with no way of disputing the charge against him. Accordingly, we hold that there was no due process violation here.

¶ 73    We likewise hold that the trial court acted within its discretion under our supreme court rules by refusing to sanction the State. On appeal, defendant does not explicitly reiterate the primary argument that his defense counsel raised below—that the appropriate sanction would be to dismiss the charges. As the trial court recognized, such an extreme sanction was unwarranted, given that the lost evidence was not crucial to the defense. Defendant now suggests that an appropriate remedy would have been to give the jury an instruction that would have allowed it to

be either "suspicious or dismissive of the lost evidence." However, the defense never tendered such an instruction, so defendant's argument is forfeited. See *People v. Hopp*, 209 Ill. 2d 1, 7 (2004) ("[A] party that fails to tender a jury instruction may not raise the failure to give the instruction on appeal.").

¶ 74                                                          D. 911 Call

¶ 75    Defendant next argues that the court violated the Confrontation Clause by allowing the State to play a very small excerpt from a 911 call, in which Eva told the dispatcher that the offenders' faces were not covered.

¶ 76    The sixth amendment to the United States Constitution provides that, in all criminal prosecutions, the accused shall enjoy the right "to be confronted with the witnesses against him." U.S. Const., amend. VI. Pursuant to this clause, "[t]estimonial statements of witnesses *absent from trial* have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004). Here, Eva testified at trial and was subject to cross-examination. Thus, there was no Confrontation Clause violation, and defendant conceded as much at oral argument. See *People v. Kitch*, 239 Ill. 2d 452, 467 (2011) ("Under *Crawford*, the confrontation clause poses no restrictions on the admission of hearsay testimony if the declarant testifies at trial and is present 'to defend or explain' that testimony." (quoting *Crawford*, 541 U.S. at 59 n.9)).

¶ 77                            E. Sufficiency of the Evidence—Identification

¶ 78    Finally, defendant challenges the sufficiency of the evidence supporting that he was correctly identified as one of the perpetrators of the home invasion. Essentially, he argues that his sister's testimony that he had facial hair on January 23, 2018, undermines the eyewitnesses'

identifications. The State responds that it proved beyond a reasonable doubt that defendant was one of the perpetrators of the home invasion.

¶ 79     As mentioned in a preceding section of this disposition, when evaluating the sufficiency of the evidence, we use the highly deferential *Jackson* standard. See *Jackson*, 443 U.S. at 319 ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original). It is the jury's responsibility to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. In conducting our review, we remain cognizant that "a single credible eyewitness is sufficient for a conviction." *Moore*, 2016 IL App (1st) 133814, ¶ 55.

¶ 80     We hold that a reasonable jury could have determined that defendant was one of the perpetrators of the home invasion. Two witnesses, Eva and Jermy, identified defendant as one of the perpetrators. Jermy was previously familiar with defendant and testified that he recognized defendant's face and voice. Although the home invasion occurred at night and apparently lasted only a few minutes, Eva and Jermy testified that they had a sufficient opportunity, and sufficient lighting, to observe the face of the armed intruder. Within a week of the home invasion, Eva and Jermy separately identified defendant as the armed intruder from photographic arrays (Jermy identified defendant on the day after the home invasion). There also was evidence that defendant knew that Jermy won money gambling, which may have given defendant a motive to commit the crime.

¶ 81     Nevertheless, we reject the State's characterization of the evidence against defendant as "overwhelming." There was no physical evidence linking defendant to the crime, and defendant never made any incriminating statements to the police. There was testimony that defendant had

noticeable facial hair on the date of the home invasion, which would have been inconsistent with the descriptions that Eva and Jermy provided of the armed intruder. Defendant also presented an alibi defense, which was supported by his own testimony and his family members' testimony. Defendant's cell phone records arguably were consistent with his alibi defense, though the records did not exclude the possibility that defendant committed the crime.

¶ 82 This case came down to witness credibility. The jury had to assess the strength of the eyewitness identifications and evaluate the credibility of defendant and his witnesses. Although the evidence was not overwhelming, it was sufficient. A reasonable jury could have determined beyond a reasonable doubt that Eva and Jermy accurately identified defendant as one of the perpetrators of the home invasion.

¶ 83                                III. CONCLUSION

¶ 84 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 85 Affirmed.